UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

ORIGINAL

UNITED STATES OF AMERICA,          :          INDICTMENT

                -v.-               :          13 Cr. _____ (_____)

EDGAR PALTZER and                  :
STEFAN BUCK,
                                   :
            Defendants.
                                   :          13 CRIM 282

- - - - - - - - - - - - - - - - - -x

## COUNT ONE
### (Conspiracy)

The Grand Jury charges:

### The Defendants and Associated Entities

1.     At all times relevant to this Indictment, EDGAR
PALTZER, the defendant, was a citizen of the United States and a
resident of Switzerland.

2.     At all times relevant to this Indictment, EDGAR
PALTZER, the defendant, was an attorney.  In or about 1984,
PALTZER was admitted to the bar in Switzerland.  In or about
1987, PALTZER obtained an advanced degree in taxation at a law
school in the United States and, in or about 1988, was admitted
to the bar of the State of New York.  PALTZER is currently
registered as an attorney in the State of New York.  In or about
1998, PALTZER began employment with a Swiss law firm based in
Zurich (the "Swiss Law Firm") and, eventually, became a partner
of the Swiss Law Firm.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  APR 1 6 2013

3.    At all times relevant to this Indictment, the areas of law in which EDGAR PALTZER, the defendant, practiced were "international private client work, wealth transfer planning, successions, trusts and foundation[s], on-shore and off-shore structures, private banking[,] and individual taxation."

4.    At all times relevant to this Indictment, STEFAN BUCK, the defendant, was a citizen and resident of Switzerland.

5.    Swiss Bank No. 1 is a private Swiss bank that has, since in or about 2000, provided, among other services, advisory and portfolio management services for individuals and entities, including U.S. taxpayers in the Southern District of New York.   At all times relevant to this Indictment, Swiss Bank No. 1 did not maintain any offices in the United States.   The founder and chairman of the board of directors of Swiss Bank No. 1 is a partner of EDGAR PALTZER, the defendant, at the Swiss Law Firm and, like PALTZER, obtained an advanced degree at a law school in the United States.

6.    Starting in or about June 2007, STEFAN BUCK, the defendant, worked at Swiss Bank No. 1 as a client advisor to various individuals, including U.S. taxpayers who maintained accounts at Swiss Bank No. 1.   From in or about December 2007, BUCK has been the head of private banking for Swiss Bank No. 1.

Beginning in or about December 2012, BUCK was named to the three-person executive board of Swiss Bank No. 1.

7.    As of approximately September 30, 2012, Swiss Bank No. 1 had approximately 1.995 billion Swiss francs in assets under management ("AUM"), equating to approximately $2.12 billion.  As of approximately September 30, 2012, approximately 882.5 million Swiss francs of this AUM, equating to approximately $938 million, or approximately 44 percent of Swiss Bank No. 1's total AUM, were held at Swiss Bank No. 1 on behalf of persons who were U.S. taxpayers living in the United States.

8.    In or about February 2009, UBS AG ("UBS"), another Swiss bank that provided private banking services to U.S. taxpayers, entered into a deferred prosecution agreement with the Department of Justice and admitted that it had participated in a scheme to defraud the Internal Revenue Service (the "IRS").  In or about February 2012, Wegelin & Co. ("Wegelin"), another Swiss bank that provided private banking services to U.S. taxpayers, was indicted by a grand jury sitting in the Southern District of New York for conspiring with U.S. taxpayers to defraud the IRS, to evade taxes, and to file false tax returns with the IRS.  Between approximately February 2009 and February 2012, the number of Swiss Bank No. 1 clients who were U.S. taxpayers grew by approximately 300 percent.

9.    At all times relevant to this Indictment, the vice chairman of the board of directors of Swiss Bank No. 1 was one of the managing partners of Wegelin.  Wegelin provided various back-office services to Swiss Bank No. 1, including permitting Swiss Bank No. 1 to have checks to Swiss Bank No. 1's clients issued from Wegelin's correspondent bank account in the United States.  This permitted, among other things, Swiss Bank No. 1 to assist U.S. taxpayer clients in repatriating undeclared funds held at Swiss Bank No. 1 to the United States.

## Obligations of United States Taxpayers
## With Respect to Foreign Financial Accounts

10.    Citizens and residents of the United States who have income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") are obligated to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the IRS.  At all times relevant to this Indictment, Form 1040 required U.S. taxpayers to report their income from any source, regardless of whether the source of their income is inside or outside the United States.  In addition, on Schedule B of Form 1040, the filer must indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  If

the U.S. taxpayer answers that question in the affirmative, then the U.S. taxpayer must indicate the name of the particular country in which the account is located.

11.   Separate and apart from the obligation to file Forms 1040 that include all income, U.S. taxpayers who have a financial interest in, or signature authority over, a financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year are required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR").  The FBAR for any calendar year is required to be filed on or before June 30 of the following calendar year.  In general, the FBAR requires that the U.S. taxpayer filing the form identify the financial institution with which the financial account is held, the type of account (bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed.

12.   An "undeclared account" is a financial account maintained outside the United States and beneficially owned by a U.S. taxpayer, but that is not disclosed to the IRS on Schedule B of Form 1040 or on an FBAR, and the income generated in which was not reported to the IRS on Form 1040.

## The Conspiracy

13.   From at least in or about 2000 through in or about at least 2012, EDGAR PALTZER and STEFAN BUCK, the defendants, conspired with various U.S. taxpayers, and others known and unknown, to ensure that their U.S. taxpayer clients could hide the U.S. taxpayers' Swiss bank accounts, and the income generated in those accounts, from the taxation authority of the United States, the Internal Revenue Service (the "IRS"), via false and fraudulent federal income tax returns.

## Means and Methods of the Conspiracy

14.   Among the means and methods by which EDGAR PALTZER and STEFAN BUCK, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.   PALTZER and BUCK opened, maintained, and/or managed "undeclared accounts" on behalf of U.S. taxpayers at Swiss Bank No. 1 and other Swiss banks.

b.   PALTZER and BUCK helped U.S. taxpayers open undeclared accounts at Swiss Bank No. 1 after these U.S. taxpayers were forced to close undeclared accounts that these U.S. taxpayers had maintained at other Swiss banks.

c.   PALTZER, BUCK, and their co-conspirators used sham "foundations" formed under the laws of Liechtenstein to conceal, from the IRS and others, the ownership by U.S.

taxpayers of accounts established at Swiss Bank No. 1 and other Swiss banks and the income generated in those accounts.

        d.    PALTZER, BUCK, and their co-conspirators used sham corporations formed under the laws of Panama, among other jurisdictions, to conceal, from the IRS and others, the ownership by U.S. taxpayers of accounts established at Swiss Bank No. 1 and other Swiss banks and the income generated in those accounts.

        e.    PALTZER prepared IRS forms that falsely and fraudulently stated under penalties of perjury that the beneficial owner of a particular undeclared account maintained at Swiss Bank No. 2 was not a U.S. person, when, in truth and in fact, PALTZER knew that the beneficial owner of the particular undeclared account was a U.S. person.

        f.    U.S. taxpayers who conspired with PALTZER and BUCK filed false and fraudulent Forms 1040, which, among other things, failed to report their interest in their undeclared accounts and the income generated in their undeclared accounts.

        g.    U.S. taxpayers who conspired with PALTZER and BUCK failed to file FBARs identifying their undeclared accounts or filed false and fraudulent FBARs omitting their undeclared accounts.

h.   PALTZER, BUCK, and their co-conspirators transferred the assets in the undeclared accounts from one Swiss bank to another when they believed that the first Swiss bank might be forced to identify the beneficial owners of undeclared accounts to the IRS.

i.   PALTZER, BUCK, and their co-conspirators arranged for account statements for the undeclared accounts of U.S. taxpayers not to be sent to the U.S. taxpayers in the United States.

j.   Co-conspirators of PALTZER and BUCK used their undeclared accounts to receive income that had not been previously taxed.

k.   BUCK and PALTZER helped U.S. taxpayers repatriate funds to the United States from their undeclared accounts in Switzerland in a manner designed to ensure that U.S. authorities did not discover these undeclared accounts.

### PALTZER and BUCK's U.S. Taxpayer Clients

15.   At various times relevant to this Indictment, EDGAR PALTZER and STEFAN BUCK, the defendants, opened, maintained, and/or managed undeclared accounts for various U.S. taxpayers holding millions of dollars in undeclared assets. Details for several examples of U.S. taxpayers for whom PALTZER and BUCK opened, maintained, and/or managed undeclared accounts

at Swiss Bank No. 1 and other Swiss banks are set forth more
fully below.

## Client 1

16.  In or about 2005, a citizen of the United States
("Client 1"), who was then residing in California, inherited an
undeclared account from her father.  At the time, the account
was held at UBS in the name of a sham foundation formed under
the laws of Liechtenstein and denominated by combining the first
name of Client 1 with the first names of her siblings.

17.  After the death of Client 1's father, Client 1
was contacted by her father's former client advisor at UBS, who
had by then left UBS to become an independent asset manager.
The purpose of the call was to instruct Client 1 to travel to
Switzerland to split her father's account among Client 1 and
Client 1's siblings.  At the time, the balance in the account of
Client 1's father at UBS was approximately $3.1 million.

18.  In or about late 2006, Client 1 decided to
transfer the assets held at UBS to another bank.  In order to do
so, Client 1 was introduced to EDGAR PALTZER, the defendant, and
met with PALTZER in Switzerland.  During their meeting, PALTZER
advised Client 1 to keep the existence of her undeclared account
secret.  PALTZER further advised Client 1 not to disclose her
undeclared account to the U.S. authorities because, if Client 1
did, she would lose all of the money in the account and would go

9

to jail.  PALTZER recommended that Client 1 open a new account at Swiss Bank No. 2, which purported to be the oldest private bank in Zurich.  PALTZER also informed Client 1 that PALTZER had a friend who worked at Swiss Bank No. 2 and that Swiss Bank No. 2 was as secretive as other Swiss banks.

19.  In or about late 2006, Client 1 traveled to Switzerland to execute the account-opening documents for Client 1's account at the offices of Swiss Bank No. 2.  EDGAR PALTZER, the defendant, was present for the meeting, during which Client 1 was assured by a representative of Swiss Bank No. 2 that Client 1's account would not be reported to authorities in the United States.

20.  In order to facilitate the transfer of assets from UBS to Swiss Bank No. 2, EDGAR PALTZER, the defendant, used a corporation that PALTZER selected from a list of off-the-shelf corporations, Trembath Invest & Finance Inc. ("Trembath"), a corporation formed under the laws of the British Virgin Islands, to open the account at Swiss Bank No. 2 in a manner that minimized the risk of discovery by the U.S. authorities of Client 1's undeclared account.  The amount of funds transferred from UBS to Client 1's newly opened account at Swiss Bank No. 2 was approximately $1.071 million.

21.  At the meeting, EDGAR PALTZER, the defendant, also instructed Client 1 that, when Client 1 wished to withdraw

funds from her account, Client 1 should contact PALTZER, who
would, in turn, send Client 1 a check by mail.  PALTZER further
informed Client 1 that PALTZER would never send Client 1 any
checks for an amount greater than $10,000 because doing so would
trigger reporting requirements for banks in the United States.

22.  Between in or about 2007 and in or about 2009,
Client 1 requested and received numerous checks from EDGAR
PALTZER, the defendant, each of which represented a withdrawal
from her undeclared account at Swiss Bank No. 2.  These checks
were typically drawn on the U.S. based correspondent bank
account maintained by another Swiss bank, Swiss Bank No. 3, at a
financial institution in the United States.  Some of the checks
sent by PALTZER were made payable, at PALTZER's suggestion, to
Client 1's husband and Client 1's stepfather to further minimize
the risk of detection by U.S. authorities.  PALTZER also advised
Client 1 to stagger, or structure, the deposit of the checks
that PALTZER sent and to never deposit a total of more than
$10,000 in any one day in order to reduce suspicion.

23.  When Client 1 and EDGAR PALTZER, the defendant,
corresponded by e-mail concerning Client 1's undeclared account
at Swiss Bank No. 2, Client 1 and PALTZER communicated in code.
For example, Client 1 and PALTZER used the phrase "rental
income" to refer to the balance in Client 1's account at Swiss
Bank No. 2.

24.   As another example, in or about September 2008, Client 1 requested from EDGAR PALTZER, the defendant, a withdrawal of a substantial amount of money, which PALTZER split into five separate checks so as to minimize the risk of detection by U.S. authorities.   In reporting back by e-mail to Client 1 about the status of the checks, PALTZER wrote on or about September 10, 2008:

> Dear [Client 1]
>
> You should have received five postcards, including one for [your husband], not just four.
>
> I am in the process of reconstructing what happened to the fifth postcard and, if necessary, check if we can get it cancelled.  I will get back to you.
>
> With kind greetings
>
> Edgar H. Paltzer

25.   Between in or about 2007 and in or about 2009, EDGAR PALTZER, the defendant, sent to Client 1 in the United States the following checks, among others, drawn on the correspondent bank account of Swiss Bank No. 3 in a manner designed to minimize the risk of the detection by U.S. authorities of Client 1's undeclared account:

| Check No. | Approximate Amount | Payee | Approximate Date Issued |
|---|---|---|---|
| 372955 | $6,374.26 | Client 1 | 3/15/2007 |
| 372956 | $7,487.39 | Client 1's husband | 3/15/2007 |
| 373583 | $8,347.00 | Client 1's stepfather | 5/11/2007 |
| 373584 | $8,414.00 | Client 1's husband | 5/11/2007 |
| 373585 | $8,723.00 | Client 1 | 5/11/2007 |
| 378981 | $8,815.00 | Client 1's husband | 11/5/2008 |
| 378982 | $9,521.50 | Client 1 | 11/5/2008 |
| 379840 | $9,245.30 | Client 1's stepfather | 2/10/2009 |
| 379841 | $8,972.50 | Client 1 | 2/10/2009 |
| Total: | $75,899.95 | | |

26.   On Client 1's Forms 1040 for the tax years 2006 through and including 2010, Client 1 did not report either Client 1's interest in or signature or other authority over Client 1's accounts at UBS or Swiss Bank No. 2.  Moreover, for these years, Client 1 did not file an FBAR disclosing Client 1's accounts at UBS or Swiss Bank No. 2.

## Client 2

27.   In or about 1998, a citizen of the United States ("Client 2"), who was then residing in Manhattan, inherited an undeclared account from his father, who had maintained the undeclared account since the early 1990's at a Swiss bank

13

("Swiss Bank No. 4").  At all times relevant to this Indictment, Client 2 was in the business of buying and selling artwork.

28.  Upon inheriting the undeclared account, Client 2 traveled to Switzerland to meet with a client advisor at Swiss Bank No. 4 (the "Client 2 Advisor"), who became the client advisor for the undeclared account newly opened by Client 2 and into which the assets from the account of Client 2's father were transferred.

29.  In or about 2000, the Client 2 Advisor recommended that Client 2 hold his account in the name of a trust, so that Client 2 could continue to hold U.S. securities and avoid disclosure of Client 2's identity to the IRS.  The Client 2 Advisor recommended that Client 2 use the services of EDGAR PALTZER, the defendant, at the Swiss Law Firm.

30.  Thereafter, Client 2 met with EDGAR PALTZER, the defendant, at the offices of the Swiss Law Firm.  During their meeting, which largely concerned how Client 2 could avoid disclosure of Client 2's identity to the IRS, PALTZER advised Client 2 that he could create a foreign corporation, which would own a trust of which Client 2 would be the beneficiary, and that PALTZER would manage the account that would be held in the name of the foreign corporation.

31.  In or about October 2000, EDGAR PALTZER, the defendant, formed Bariloche Resources Corp., a corporation

created under the law of Panama.  PALTZER was named as the president of Bariloche Resources Corp.  Also consistent with the prior discussion between PALTZER and Client 2, PALTZER formed Bariloche Foundation, of which Client 2 was the beneficiary.

32.   In or about November 2000, EDGAR PALTZER, the defendant, acting on behalf of Bariloche Resources Corp., opened an undeclared account in the name of Bariloche Resources Corp. at Swiss Bank No. 4.

33.   In connection with opening the undeclared account, and in or about November 2000, EDGAR PALTZER, the defendant, falsely and fraudulently swore in a Form W-8BEN, entitled Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, under penalties of perjury that the beneficial owner of the Bariloche Resources Corp. account at Swiss Bank No. 4 was not a U.S. person.  In truth and in fact, and as PALTZER then and there well knew, the beneficial owner of the account at Swiss Bank No. 4 was Client 2 and also a U.S. person.  PALTZER re-executed another Form W-8BEN for the Bariloche Resources Corp. in or about December 2003.  The December 2003 Form W-8BEN contained the same false and fraudulent statement concerning the beneficial owner of the Bariloche Resources Corp. account at Swiss Bank No. 4.

34.   In or about November 2003, Client 2 visited the offices of Swiss Bank No. 4 and met with the Client 2 Advisor to

inquire regarding the performance in the undeclared account maintained on his behalf in the name of Bariloche Resources Corp., reflecting that the Client 2 Advisor was well aware that Bariloche Resources Corp. was a sham entity and that Client 2 actually controlled the account held in the name of that entity.

35.   EDGAR PALTZER, the defendant, frequently requested that Swiss Bank No. 4 withdraw large amounts of cash from Client 2's undeclared account at Swiss Bank No. 4 and either: (a) deliver the cash to PALTZER at his address at the Swiss Law Firm; (b) pay the cash to Client 2; or (c) make the cash available for payment in another location.  For example:

a.   On or about July 13, 2004, PALTZER wrote to the Client 2 Advisor at Swiss Bank No. 4:

> Please be kind enough to arrange for a cash payment/withdrawal of Euro 300[,]000 (Euro threehundred [sic] thousand) to be delivered to our mailing address.

b.   On or about June 8, 2005, PALTZER wrote to the Client 2 Advisor at Swiss Bank No. 4:

> Please be kind enough to arrange for cash payment of €10,000. -- in Brussels as discussed.

36.   Between in or about 2000 and in or about late 2005, Client 2 met with the Client 2 Advisor in Manhattan on a handful of occasions to discuss the undeclared account held by Client 2 at Swiss Bank No. 4.  On those occasions, the Client 2 Advisor had documents concerning the undeclared account with him

to review with Client 2.  On one occasion, the Client 2 Advisor
stated that it was safe because the documents had been printed
in the United States and that the Client 2 Advisor had not
traveled with the documents.

37.   In or about 2005, EDGAR PALTZER, the defendant,
advised Client 2 that Client 2 should start looking for another
Swiss bank that, unlike Swiss Bank No. 4, had no offices located
in the United States and, therefore, was not exposed to U.S. law
enforcement.  PALTZER's advice made Client 2 fear that Client
2's undeclared account was in danger of being detected by the
IRS.

38.   In or about late 2005, EDGAR PALTZER, the defendant,
identified Swiss Bank No. 2 as the institution at
which Client 2 should open a new undeclared account.  PALTZER
further advised Client 2 that PALTZER would create a new foreign
corporation to hold Client 2's new undeclared account at Swiss
Bank No. 2 and that the funds in Client 2's account at Swiss
Bank No. 4 would be transferred to Swiss Bank No. 2 via
certified check, that is, a check not drawn on Client 2's
account at Swiss Bank No. 4, in order to make tracing the
transaction more difficult.

39.   In or about December 2005, EDGAR PALTZER, the
defendant, escorted Client 2 to the offices of Swiss Bank No. 2.

During the meeting with a representative of Swiss Bank No. 2, Client 2 presented his U.S. passport.

40.   In or about December 2005, EDGAR PALTZER, acting as a director of Bariloche Resources Corp., directed Swiss Bank No. 4 in writing to liquidate all investments in the undeclared account maintained in the name of Bariloche Resources Corp. in order for the funds to be transferred to Swiss Bank No. 2.

41.   On or about December 29, 2005, EDGAR PALTZER, the defendant, caused approximately $1.45 million to be transferred from Client 2's undeclared account at Swiss Bank No. 4 to an account with the code name "Gadget" at another Swiss bank, Swiss Bank No. 5.   Thereafter, on or about January 12, 2006, these funds were transferred, in Swiss francs, to Swiss Bank No. 2, where they were held in the name of Kustunder Enterprises, Inc., a foreign corporation formed by PALTZER for the purpose of holding Client 2's undeclared account at Swiss Bank No. 2.

42.   During the time that Client 2 held his undeclared accounts at Swiss Bank No. 4 and, later, Swiss Bank No. 2, Client 2 used these accounts to purchase and sell artwork abroad, transactions that were facilitated by EDGAR PALTZER, the defendant.   Specifically:

a.   In order to purchase artwork, Client 2 instructed PALTZER to pay the seller of the artwork out of Client 2's undeclared account at either Swiss Bank No. 4 or

Swiss Bank No. 2.  In turn, PALTZER instructed either Swiss Bank No. 4 or Swiss Bank No. 2 to transfer funds to the seller.  On some occasions, PALTZER instructed Swiss Bank No. 4 to provide cash to the seller of artwork upon presentation of specific documentation, such as an invoice.  Some of these works of art were purchased for $75,000 or more.

b.    In order to sell artwork, Client 2 advised the purchaser of PALTZER's contact information.  In turn, PALTZER and the purchaser coordinated the transfer of funds into Client 2's undeclared account at either Swiss Bank No. 4 or Swiss Bank No. 2.

43.  In or about 2006, the value of the assets held by Client 2 and Swiss Bank No. 2 was approximately $1.7 million.

44.  In or about 2007 through in or about 2009, EDGAR PALTZER, acting on behalf of Client 2, transferred over approximately $1.2 million from Client 2's undeclared account at Swiss Bank No. 2 to an account maintained at a bank in Liechtenstein (the "Liechtenstein Bank") in the name of an entity formed on Client 2's behalf by a third-party advisor located in the United Kingdom (the "UK Advisor") under the laws of Liechtenstein called "InterArt Global."  The purpose of the transfers to the Liechtenstein-based account held in the name of InterArt Global was to facilitate the covert repatriation of Client 2's funds to the United States.

45.   In or about 2010, Client 2 became concerned that the UK Advisor had been charged with a crime and that, as a result, Client 2's funds at the Liechtenstein Bank might be traced to him.  As a result, Client 2 requested that EDGAR PALTZER, the defendant, travel to Liechtenstein to review records relating to the InterArt Global account at the Liechtenstein Bank.  PALTZER did so and, thereafter, destroyed any records containing Client 2's name.  After completing his review, PALTZER informed Client 2 that everything appeared to be in order.  PALTZER also informed Client 2 that, in order to charge Client 2 for PALTZER's time with respect to reviewing the InterArt Global documents, PALTZER was "padding" legal bills for unrelated legal services that PALTZER was performing on behalf of Client 2.

46.   On Client 2's Forms 1040 for the tax years 2003 through and including 2010, Client 2 did not report either Client 2's interest in or signature or other authority over Client 2's accounts at Swiss Bank No. 4, Swiss Bank No. 2, and the Liechtenstein Bank.  Moreover, for these years, Client 2 did not file an FBAR disclosing Client 2's accounts at Swiss Bank No. 4, Swiss Bank No. 2, and the Liechtenstein Bank.

## Client 3

47.   In or about 1998 or 1999, a lawful permanent resident of the United States, who was then residing in

Massachusetts and Connecticut ("Client 3") opened two undeclared accounts, one at Swiss Bank No. 4 and one at UBS. The accounts were funded at their inception by Client 3's father, who transferred from somewhere in Asia several million dollars into the undeclared accounts at Swiss Bank No. 4 and UBS. Client 3's father continued transferring funds to Client 3's undeclared accounts at Swiss Bank No. 4 and UBS until approximately 2005 or 2006.

48. In or about the early 2000's, a representative of Swiss Bank No. 4 (the "Swiss Bank No. 4 representative") informed Client 3, who had traveled to Zurich, that there were changes to the ability of U.S. taxpayers to maintain undeclared accounts in Switzerland and that, as a result, Client 3 should consider holding his undeclared accounts through a trust. The Swiss Bank No. 4 representative escorted Client 3 to the offices of EDGAR PALTZER, the defendant, at the Swiss Law Firm.

49. During the subsequent meeting at the Swiss Law Firm, EDGAR PALTZER, the defendant, explained to Client 3 the benefits of holding his undeclared accounts through a trust, including that the trust was an extra layer of safety and that the trust was useful if Client 3 wished to purchase real estate or a boat inside or outside of the United States. PALTZER had at the meeting already prepared documents relating to various off-the-shelf trusts and instructed Client 3 to select one.

Client 3 selected one in the name "Daroka."  Sometime thereafter, the assets in the account at Swiss Bank No. 4 were transferred into a newly opened account in the name of Daroka Overseas Inc., an offshore company that was owned, in turn, by the Daroka trust.

50.  Thereafter, when Client 3 wished to effect transactions using the funds contained in his undeclared account at Swiss Bank No. 4, Client 3 needed the approval of EDGAR PALTZER, the defendant, because PALTZER nominally controlled the account at Swiss Bank No. 4 in the name of Daroka Overseas Inc.

51.  For example, in or about March 2008, Client 3 decided to buy an expensive ring.  In order to do so, Client 3 sent PALTZER and the Swiss Bank No. 4 representative an e-mail:

> Dear Dr. Paltzer, dear [first name of Swiss Bank No. 4 representative],
>
> Below is the information you need.
>
> [First name of Swiss Bank No. 4 representative], I want three separate checks, amount of 553, 780, 870
>
> [Address and telephone number of Connecticut-based seller of ring]

On the same day, Client 3 sent PALTZER another e-mail:

> Dear Dr. Paltzer,
>
> How have you been?  I get to the point right away.
>
> I want you to do me a favor.  [First name of Swiss Bank No. 4 representative] already knows what to do.
>
> Please give the following instructions to [First name of Swiss Bank No. 4 representative].

Send 2.203 to [Connecticut-based seller of the ring].

I will give you a call this afternoon.

Thereafter, the Connecticut-based seller of the ring that Client 3 wished to purchase received three bank checks drawn on another bank in the amounts of approximately $553,000, $780,000, and $870,000. From 2005 through 2011, PALTZER facilitated several other large purchases of gems and/or jewelry in similar fashion.

52. On or about September 13, 2006, EDGAR PALTZER, the defendant, met with Client 3 at a hotel restaurant in Manhattan.

53. In or about late 2008 or early 2009, Client 3 learned that his undeclared account at Swiss Bank No. 4 had to be closed. By this time, Swiss Bank No. 4 had decided to close its U.S. cross-border banking business for both new and existing U.S. taxpayer-clients. Thereafter, EDGAR PALTZER, the defendant, became even more cautious about his communications with Client 3 and instructed Client 3 to only use the telephone from outside the United States to contact PALTZER. PALTZER further instructed Client 3 that they should meet in France or Italy, rather than in Zurich.

54. As a result of the prospective closure of Client 3's undeclared account at Swiss Bank No. 4, the Swiss Bank No. 4 representative informed Client 3 of three options: (a) repatriating the funds then held at Swiss Bank No. 4 by

23

disclosing its existence to the U.S. authorities; (b) spending the funds; and (c) transferring the funds to another bank. Client 3 selected the option of transferring the funds to another bank.

55.   As a result of Client 3's selection of the option of transferring the funds held in his undeclared account at Swiss Bank No. 4, the Swiss Bank No. 4 representative contacted EDGAR PALTZER, the defendant, who, according to the Swiss Bank No. 4 representative, had identified another Swiss bank that would accept the funds from Client 3's undeclared account at Swiss Bank No. 4.

56.   Thereafter, in or about early 2009, Client 3 met with EDGAR PALTZER, the defendant, and the Swiss Bank No. 4 representative at the offices of the Swiss Law Firm.  PALTZER informed Client 3 that Swiss Bank No. 1 would accept the funds from Swiss Bank No. 4 and that Swiss Bank No. 1 would be a safe place to hold the funds.  PALTZER informed Client 3 that PALTZER was aware of Swiss Bank No. 1 because members of the Swiss Law Firm have family relationships with Swiss Bank No. 1 and PALTZER could approach his colleagues at the Swiss Law Firm to accept Client 3's funds from Swiss Bank No. 4.

57.   During the same trip to Zurich, EDGAR PALTZER, the defendant, arranged for Client 3 to meet with STEFAN BUCK, the defendant, at the offices of Swiss Bank No. 1.  Thereafter,

Client 3 caused PALTZER to open undeclared accounts at Swiss Bank No. 1 in the names of Daroka Overseas Inc. and another company, Edraith Invest and Finance Ltd., that Client 3 and PALTZER had used for Client 3 to purchase a home in Cape Cod.

58.   In connection with the opening and maintaining of Client 3's undeclared account at Swiss Bank No. 1, EDGAR PALTZER, the defendant, instructed Client 3 that, when Client 3 wished to withdraw cash from Swiss Bank No. 1, Client 3 should contact PALTZER with the details and PALTZER would arrange for the cash to be available at PALTZER's office at the Swiss Law Firm.   Thereafter, Client 3 withdrew between $20,000 and $50,000 on several occasions in this fashion.   Client 3 also requested that PALTZER maintain $100,000 at PALTZER's office at the Swiss Law Firm so that cash would be more readily available to Client 3.

59.   In or about June and September 2009, STEFAN BUCK, the defendant, sent e-mails to Client 3's U.S.-based e-mail address.

60.   In or about 2011, Client 3 decided to close his undeclared account at Swiss Bank No. 1.   EDGAR PALTZER, the defendant, advised Client 3 that Client 3 could purchase jewelry in order to repatriate to the United States the funds in his undeclared account at Swiss Bank No. 1.   In order to do so:

a.    First, funds were transferred from Client 3's account at Swiss Bank No. 1 to a jeweler in Switzerland (the "Swiss Jeweler"), who had a brother in New York who was also in the jewelry business (the "New York Jeweler").

b.    Second, after the initial transfer of funds to the Swiss Jeweler from Client 3's account at Swiss Bank No. 1, the New York Jeweler caused to be delivered to a local jeweler in Connecticut certain jewelry to be retrieved by Client 3 and Client 3's wife.

61.    Client 3 purchased a significant amount of jewelry in this fashion.  For example:

a.    In or about April 2011, Client 3 caused to be transferred from his undeclared account at Swiss Bank No. 1, with the assistance of PALTZER, approximately $1,988,450 to the Swiss Jeweler for the delivery, through the New York Jeweler and in the United States, of a ruby ring.

b.    In or about August 2011, Client 3 caused to be transferred, with the assistance of PALTZER, approximately $1,714,592 from Client 3's undeclared account at Swiss Bank No. 1 to the Swiss Jeweler for the delivery, through the New York Jeweler and in the United States, of various loose diamonds.

62.    On Client 3's Forms 1040 for the tax years 2006 through and including 2010, Client 3 did not report either Client 3's interest in or signature or other authority over

Client 3's accounts at Swiss Bank No. 4, UBS, and Swiss Bank No. 1. Moreover, for these years, Client 3 did not file an FBAR disclosing Client 3's accounts at Swiss Bank No. 4, UBS, and Swiss Bank No. 1.

### Client 4

63.   At all times relevant to the Indictment, Client 4 was a resident of Arizona and a citizen of the United States. From at least in or about 2005, Client 4 maintained an undeclared account at the Swiss private banking subsidiary of a French bank ("Swiss Bank No. 6"). In or about 2009, Swiss Bank No. 6 informed Client 4 that Client 4 had to close his account. After being asked by Client 4 to recommend another Swiss bank that would be willing to maintain Client 4's undeclared account, Client 4's client advisor at Swiss Bank No. 6 recommended Swiss Bank No. 1 and provided Client 4 with the contact information for STEFAN BUCK, the defendant.

64.   After receiving contact information for STEFAN BUCK, the defendant, Client 4 contacted BUCK and BUCK sent to Client 4 in Arizona documents necessary to open an account at Swiss Bank No. 1.

65.   In or about October 2009, Client 4 and his wife wrote a letter to STEFAN BUCK, the defendant, regarding opening an account at Swiss Bank No. 1. Although the letter stated that it was not the intention if Client 4 and his wife to "avoid

paying U.S. income taxes," Client 4 and his wife sought
assurances from BUCK that the account would not be disclosed to
the IRS.

   a. For example, in the letter to BUCK, Client 4
and his wife asked BUCK:

> [U]nder what circumstances if any are you required to
> notify the IRS [regarding the existence of the
> account]?

   b. In a conversation to follow up on this
letter, BUCK told Client 4 and his wife, in substance and in
part, that in order to avoid the IRS discovering the account:
(1) Swiss Bank No. 1 must have discretionary authority over the
account, that is, the authority to make investment decisions for
the account; (2) the account could not hold any U.S. securities;
and (3) Client 4 and his wife should not conduct any transfers
in or out of the account in U.S. dollars, because such transfers
would "clear" in the United States and were therefore
detectable.

   c. Also in the letter of October 2009, Client 4
and his wife asked BUCK a question on the Swiss Bank No. 1
account-opening documents regarding whether Client 4 required a
tax statement: "may I assume that the correct answer is 'yes'
but only to be held by you to record taxes paid on dividend
income if unhappy circumstances should come to pass?" During
the follow up conversation regarding these questions, BUCK

advised them to mark "no" as to whether they required a tax statement. BUCK also advised Client 4 and his wife to leave the section of the account-opening documents dealing with "tax status" blank.

66. After having their questions answered by STEFAN BUCK, the defendant, Client 4 and his wife opened a jointly-held undeclared account at Swiss Bank No. 1 and transferred their assets from the undeclared account held at Swiss Bank No. 6. Client 4 and his wife provided a copy of their U.S. passports to BUCK when they sent him the completed account-opening documents. Client 4 and BUCK also established the code word "PV" to refer to account statements in the event that Client 4 ever wished to have BUCK send them such statements in the United States.

67. After establishing the undeclared account at Swiss Bank No. 1, Client 4 began contacting STEFAN BUCK, the defendant, to request that BUCK send Client 4 funds in the United States. For example:

a. In or about February 2010, Client 4 wrote to STEFAN BUCK the defendant, the following:

> Requests for Stefan:
>
> Please send in batches of three, USD cheques made in favor of [Corporate entity controlled by Client 4, "Client 4 Entity"] (our subchapter S corporation) as follows:
>
> One month after the inception of the account, $4788, $4908, $4889.

Two months later, $4833, $4805, $4922

Three months later, $3555, $4245, $4010

Three months later. $4909, $4554, $4650

I believe that DHL is your preferred carrier.  Is this correct?

Each of these cheques will be cashed over a period of time following receipt which might be up to five months unless you have a rule precluding holding them open that long

     b.   In or about September 2010, Client 4 wrote the following to STEFAN BUCK, the defendant:

We have settled on a schedule for checks to be sent.

| September 1 | $4,738 $4,908 $4,889 |
| December  1 | $4,833 $4,805 $4,922 |

As we have discussed previously, the checks should be drawn in the U.S. dollars on your corresponding US bank and made in favor of:

[the Client 4 Entity]

The checks will be cashed over a period of time after receipt, up to four months, *unless* [Swiss Bank No. 1] has a rule precluding holding them open that long [emphasis in original].

.  .  .  .

I expect to send a similar schedule for 2011 towards the end of this year.  As usual, please let me know if you have any questions about these arrangements.

     68.   In or about late 2010, the value of the assets held by Client 4 and Client 4's wife in their undeclared account at Swiss Bank No. 1 was approximately $2.163 million.

69.   On or about March 16, 2011, Client 4 wrote the following to STEFAN BUCK, the defendant:

> Another shipment, please.  Three items:  4883, 4809 & 4962. Thanks much, [Client 4].

70.   Client 4 received in Arizona by mail from Switzerland the following checks, among others, that were sent by STEFAN BUCK, the defendant, and that were drawn on the correspondent account maintained by Wegelin at UBS in the United States:

| Check No. | Approximate Amount | Payee | Approximate Date Issued |
|---|---|---|---|
| 4361 | $4,833 | Client 4 Entity | 12/9/2010 |
| 4363 | $4,922 | Client 4 Entity | 12/9/2010 |
| 4415 | $29,371 | A car dealership | 1/28/2011 |
| 4416 | $3,600 | Client 4 | 1/28/2011 |
| 4417 | $2,850 | Client 4 | 1/28/2011 |
| 4483 | $4,883 | Client 4 Entity | 3/17/2011 |
| 4484 | $4,809 | Client 4 Entity | 3/17/2011 |
| 4485 | $4,962 | Client 4 Entity | 3/17/2011 |
| 4496 | $4,883 | Client 4 Entity | 7/11/2011 |
| 4597 | $4,809 | Client 4 Entity | 7/11/2011 |
| 4598 | $4,962 | Client 4 Entity | 7/11/2011 |
| Total: | $74,884 | | |

71.   When Client 4 began to receive the checks drawn on Wegelin's U.S.-based correspondent bank account from STEFAN BUCK, the defendant, Client 4 expressed his discomfort to BUCK that these checks were easily identifiable as coming from a Swiss bank.   BUCK explained that Swiss Bank No. 1 used Wegelin for this service and that this was how it was done.

72.   In or about August 2011, Client 4's fears regarding the use by Swiss Bank No. 1 of Wegelin's U.S.-based correspondent bank account were realized.   As a result, Client 4's wife wrote by e-mail to STEFAN BUCK, the defendant:

> Dear Stefan,
>
> I hope this finds you well and having a good summer. We are OK, but there is some sad news.   Apparently, the funds sent to the U.S. from [Swiss Bank No. 1] were sent through another Swiss bank that is presently the target of an investigation by the United States District Court in New York.   We are in receipt of a subpoena demanding our testimony and documents in relation to this affair.

73.   In a conversation following this e-mail, STEFAN BUCK, the defendant, speculated to Client 4 that, had BUCK sent wire transfers, rather than checks, Client 4's undeclared account would not have been detected.

74.   On Client 4's Forms 1040 for the tax years 2005 through and including 2011, Client 4 did not report either Client 4's interest in or signature or other authority over Client 4's accounts at Swiss Bank No. 6 and Swiss Bank No. 1.

Moreover, for the tax years 2005 through and including 2010, Client 4 did not file an FBAR disclosing Client 4's accounts at Swiss Bank No. 6 and Swiss Bank No. 1.

### Client 5 & Client 5's Daughters

75.   In or about 1990, a citizen of the United States ("Client 5"), who was then residing in Manhattan, held an undeclared account with her husband at a Swiss bank ("Swiss Bank No. 7"). In or about 1990, Client 5's husband died. In or about 1998, Client 5 had the undeclared account transferred from being held in the name of her and her late husband, to being held in her name alone. Client 5's two daughters ("Client 5's Daughters"), who also resided in Manhattan at all times relevant to this Indictment, were also granted signature authority over the account.

76.   In or about May 2009, during a visit to Swiss Bank No. 7 in Switzerland, a client advisor at Swiss Bank No. 7 informed Client 5 and Client 5's Daughters that Swiss Bank No. 7 was closing accounts held by U.S. taxpayers. The client advisor at Swiss Bank No. 7 recommended Swiss Bank No. 1 to Client 5 and Client 5's Daughters.

77.   After this meeting at Swiss Bank No. 7, Client 5 and Client 5's Daughters walked to Swiss Bank No. 1, where they met with STEFAN BUCK, the defendant. BUCK told Client 5 and Client 5's Daughters that Swiss Bank No. 1 was a private Swiss

bank with no connection to the United States and that Swiss Bank No. 1 was not bound to make any sort of disclosure to U.S. authorities.  BUCK further stated that U.S. authorities did not have leverage over Swiss Bank No. 1.  Client 5 and Client 5's Daughters were informed that Swiss Bank No. 1 only accepted accounts with a value greater than $500,000.

78.  After meeting with STEFAN BUCK, the defendant, Client 5 and Client 5's Daughters opened a new undeclared account at Swiss Bank No. 1 and transferred the assets held in their account at Swiss Bank No. 7 to Swiss Bank No. 1, which were valued at approximately $329,000 at the time.  The account was held in the name of Client 5, with Client 5's Daughters also having signature authority over the account.

79.  On Client 5's and Client 5's Daughters' Forms 1040 for the tax years 1998 through and including 2009, Client 5 and Client 5's Daughters did not report either their interest in or signature or other authority over their accounts at Swiss Bank No. 7 and Swiss Bank No. 1.  Moreover, for those years, Client 5 and Client 5's Daughters did not file an FBAR disclosing their accounts at Swiss Bank No. 7 and Swiss Bank No. 1.

## Client 6

80.  In or about 2008, a citizen of the United States ("Client 6"), who was then residing in Florida, inherited an

undeclared account held Swiss Bank No. 7.  This account was held in the name of an entity, Talcoria S.A., and managed with the assistance of an external asset manager in Switzerland (the "Swiss Asset Manager").  In or about early 2009, Client 6 traveled to Swiss Bank No. 7 in Switzerland and had the account documents amended to reflect that Client 6 was the beneficial owner of the account.  Shortly thereafter, Client 6 was contacted by the Swiss Asset Manager and informed that Swiss Bank No. 7 would no longer maintain accounts for U.S. taxpayers.

81.  In or about February 2009, Client 6 returned to Switzerland to meet with his client advisor at Swiss Bank No. 7 and the Swiss Asset Manager.  During the meeting, the Swiss Bank No. 7 client advisor and the Swiss Asset Manager told Client 6 that they intended to transfer Client 6's account to Swiss Bank No. 1.  The client advisor and the Swiss Asset Manager told Client 6 that it was difficult to find a Swiss bank that would take Americans, but that they were able to find Swiss Bank No. 1.

82.  During that same trip, Client 6 went to Swiss Bank No. 1 with the Swiss Asset Manager and met with STEFAN BUCK, the defendant, to open an undeclared account, also held in the name of Talcoria S.A., and to transfer his assets from Swiss Bank No. 7 to Swiss Bank No. 1.  During this meeting, Client 6 asked whether he needed to report this account to U.S.

authorities.  BUCK told Client 6 that Client 6 did not need to
reveal the account to U.S. authorities because Swiss Bank No. 1
operated exclusively in Switzerland and the U.S. tax rules did
not apply to Swiss Bank No. 1.

83.  Thereafter, in or about March 2009, the assets in
Client 6's account at Swiss Bank No. 7 were transferred to
Client 6's newly opened undeclared account at Swiss Bank No. 1.
The value of the assets transferred by Client 6 to Swiss Bank
No. 1 was approximately $3.57 million.

84.  After opening the account at Swiss Bank No. 1,
Client 6 occasionally traveled to Swiss Bank No. 1 to meet with
STEFAN BUCK, the defendant, and the Swiss Asset Manager to
discuss Client 6's undeclared account at Swiss Bank No. 1.

85.  In or about July 2011, Client 6 decided to enter
the voluntary disclosure program and disclose his undeclared
account at Swiss Bank No. 1 to the IRS.  In or about the summer
of 2011, Client 6 traveled to Swiss Bank No. 1 in Switzerland
and met with STEFAN BUCK, the defendant, and the Swiss Asset
Manager.  During this meeting, BUCK told Client 6 that Client 6
did not have to enter the program.  BUCK again stated that Swiss
Bank No. 1 operated only in Switzerland and that U.S. rules did
not apply to Swiss Bank No. 1.  BUCK further stated to Client 6
that the president of Swiss Bank No. 1 was a lawyer who had
worked in the U.S. and that this individual knew the rules and

that the rules did not apply to Client 6's account.   Client 6
nevertheless disclosed his account to the IRS.

86.   On Client 6's Forms 1040 for the tax years 2008
through and including 2010, Client 6 did not report either his
interest in or signature or other authority over his accounts at
Swiss Bank No. 7 and Swiss Bank No. 1.   Moreover, for those
years, Client 6 did not file an FBAR disclosing his accounts at
Swiss Bank No. 7 and Swiss Bank No. 1.

### Statutory Allegations

87.   From at least in or about 2000 through in or
about at least 2012, in the Southern District of New York and
elsewhere, EDGAR PALTZER and STEFAN BUCK, the defendants,
together with various U.S. taxpayers, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other, to defraud
the United States of America and an agency thereof, to wit, the
IRS, and to commit offenses against the United States, to wit,
violations of Title 26, United States Code, Section 7201, and
Title 26, United States Code, Section 7206(1).

88.   It was a part and an object of the conspiracy
that EDGAR PALTZER and STEFAN BUCK, the defendants, together
with various U.S. taxpayers, and others known and unknown,
willfully and knowingly would and did defraud the United States
of America and the IRS for the purpose of impeding, impairing,

obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

89.   It was further a part and an object of the conspiracy that EDGAR PALTZER and STEFAN BUCK, the defendants, together with various U.S. taxpayers, and others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America from clients of PALTZER and BUCK who were U.S. taxpayers, in violation of Title 26, United States Code, Section 7201.

90.   It was further a part and an object of the conspiracy that EDGAR PALTZER and STEFAN BUCK, the defendants, together with various U.S. taxpayers, and others known and unknown, willfully and knowingly would and did make and subscribe returns, statements, and other documents, which contained and were verified by written declarations that they were made under the penalties of perjury, and which PALTZER and BUCK, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

### Overt Acts

91.   In furtherance of the conspiracy and to effect the illegal objects thereof, EDGAR PALTZER and STEFAN BUCK, the

38

defendants, together with various U.S. taxpayers, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about September 10, 2008, PALTZER wrote an e-mail to Client 1.

b.   On or about July 13, 2004, PALTZER wrote to a representative of Swiss Bank No. 4 to request that cash from Client 2's undeclared account be delivered to PALTZER's office.

c.   In or about June and September 2009, BUCK sent e-mails to Client 3's U.S.-based e-mail address.

d.   In or about December 2010, BUCK sent checks to Client 4 in Arizona drawn on Wegelin's U.S.-based correspondent bank account.

e.   In or about May 2009, BUCK opened a new undeclared account for Client 5 at Swiss Bank No. 1.

f.   On or about April 15, 2010, Client 5, a resident of Manhattan, mailed to the IRS a Form 1040, on which Client 5

did not report either her interest in, or signature or other

authority over, her account at Swiss Bank No. 1.

(Title 18, United States Code, Section 371.)


_____                              _Preet Bharara_
FOREPERSON                                                PREET BHARARA
                                                          United States Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

-v.-

**EDGAR PALTZER and**
**STEFAN BUCK,**

Defendants.

**INDICTMENT**

13 Cr. _____ (_____)

(Title 18, United States Code,
Section 371.)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

Foreperson.

*4/16/13 - Filed Indictment. A/W issued.*
*ec Case assigned to Judy Marrero,*
*Judge Forever*
*US MJ*