UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                    IND. NO. 13 CRIM. 282 (VM)

STEFAN BUCK,

　　　　　　Defendant.

## DEFENDANT STEFAN BUCK'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT

MARC AGNIFILO
Of Counsel
Brafman & Associates, P.C.
767 Third Avenue
New York, New York 10017
(212)750-7800

**Table of Contents**

PRELIMINARY STATEMENT ........................................................................1

   Background ....................................................................................2

     1.  Swiss Law and United States Efforts to Collect Taxes on Overseas Income..........2

       A.  The Centuries-Old Tradition and 83 Year Old Law Of Bank Client Confidentiality ...............................................................2

       B.  Early U.S. Investigations Focused on the U.S. Taxpayer...........................4

       C.  The Qualified Intermediary Program and a Change of Focus....................5

       D.  The U.S. Implicates Swiss Banks, Bankers and External Asset Managers..................................................................6

     2.  Bank Frey and Stefan Buck ...................................................8

       A.  Brief Background on Bank Frey...........................................8

       B.  Buck's Career at Bank Frey.................................................9

       C.  The Bank's Swiss-Only Philosophy .....................................9

       D.  Structures as Clients of the Bank.......................................10

       E.  The Swiss Financial Market Authority (FINMA) ....................12

STATEMENT OF FACTS ...........................................................................14

     1. Client One.......................................................................14

     2. Client Two.......................................................................15

     3. Client Three ....................................................................15

     4. Client Four ......................................................................18

     5. Client Five ......................................................................20

     6. Client Six ........................................................................20

     7. Comparison of Paltzer and Buck ........................................21

ARGUMENT..........................................................................................22

   POINT ONE

   THE "DEFRAUD THE UNITED STATES" OBJECT OF THE CONSPIRACY OFFENSE IS UNCONSTITUTIONALLY VAGUE.......................................22

POINT TWO

THE CHARGED CONSPIRACY DOES NOT APPLY
EXTRATERRITORIALLY ........................................................................26

    1.  Extraterritorial Applicability of The Tax Evasion Provision (Sec. 7201)

        and False Declaration Provision (Sec. 7206) of Title 26......................................27

    2. Extraterritorial Applicability of the "Defraud The United States Provision"..........28

POINT THREE

EXTRATERRITORIAL APPLICATION OF THE CONSPIRACY OFFENSE
WOULD CONFLICT WITH THE SWISS LAW OF BANK CLIENT
CONFIDENTIALITY ........................................................................30

POINT FOUR

BUCK LACKED FAIR NOTICE THAT THIS CONDUCT WAS ILLEGAL;
ALSO, THERE IS NOT A SUFFICIENT NEXUS BETWEEN BUCK'S
CONDUCT AND THE UNITED STATES ................................................31

    1. Lack of Fair Notice................................................................32

    2. Insufficient Constitutional Nexus ........................................33

POINT FIVE

IN LIGHT OF THE NON-PROSECUTION AGREEMENTS REACHED WITH
OVER EIGHTY SWISS BANKS, WHOSE CONDUCT WAS COMPERABLE
IF NOT WORSE THAN BUCK'S, THIS CASE SHOULD BE DISMISSED AS
A MATTER OF FUNDAMENTAL FAIRNESS............................................33

CONCLUSION....................................................................................37

## Table of Authorities

### Statutes

18 U.S.C. § 371 ............................................................................................................. 23, 25, 26, 29, 31

18 U.S.C. § 2339B ............................................................................................................................. 28

26 U.S.C. § 7201 ......................................................................................................................... 22, 27

26 U.S.C. § 7206 ......................................................................................................................... 22, 27

### Cases

United States v. Ali, 718 F.3d 929 (D.C. Cir. 2013) .............................................................. 27, 28, 30

Almendarez-Torres v. United States, 523 U.S. 224, 237 (1998) ................................................... 30

United States v. Ballestas, 795 F. 3d 138 (D.C. Cir. 2015) ............................................................ 27

United States v. Coplan, 703 F.3d 46 (2d Cir. 2012) ............................................................... 24, 29

EEOC v. Arabian American Oil Co., 499 U.S. at 244 ............................................... 26, 27, 30, 31

United States v. Gradwell, 243 U.S. 476, 478, 485 (1917) ...................................................... 23, 24

Hammerschmidt v. United States, 265 U.S. 182, 185-6 (1924) ...................................................... 24

United States v. Kassar, 660 F.3d 108 (2d Cir. 2011) .................................................................... 28

Kiobel v. Royal Dutch Petroleum Co., __ U.S. __, 133 S.Ct. 1659, 1664 (2013) ................................ 26, 30

Kiobel, __ U.S. __, 133 S.Ct. at 1664 (2013) ................................................................................ 31

United States v. Klein, 247 F.2d 908 (2d Cir. 1957) ............................................... 24, 25, 29, 35

Kolender v. Lawson, 461 U.S. 352, 357 (1983) ............................................................................. 23

United States v. Mardirossian, 818 F.Supp.2d 775 (S.D.N.Y. 2011) ...................................... 27, 28

Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454 (2007) ........................................................... 26

Morrison v. National Australia Bank Ltd, 561 U.S. 247, 255 (2010). ..................................... 26, 27

Murray v. Schooner Charming Betsy, 6 U.S. 64, 64 (1804) .......................................................... 30

Skilling v. United States, 561 U.S. (2010) 561 U.S. at 364 ........................................................... 23

Smith v. United States, 507 U.S. 197, 204 (1993) ......................................................................... 26

United States v. Vilar, 729 F.3d 62, 72 (2d Cir. 2013) ................................................................... 29

United States v. Wegelin & Co., et al., 12 Cr. 02 (JSR) ................................................. 7, 32, 35

United States v. Yousef, 327 F.3d 56 (2d Cir. 2003) ............................................................ 31

## Journals

Comment, Secret Swiss Bank Accounts: Uses, Abuses, and Attempts at Control, Fordham Law
Review, Vol 39, Issue 3, 1971, p. 501 ............................................................................... 3, 5

Friedrich, The Anonymous Bank Account in Switzerland, Journal of Business Law, 1962, p. 18 ............. 3

Mueller, The Swiss Banking Secret, 18 Int'l & Comp. L.Q., 360, 361 (1969)........................................ 3

Aubert, The Limits of Swiss Banking Secrecy Under Domestic and International Law, Berkely
Journal of International Law, Fall 1984, Vol 2, p. 274 ............................................................... 4

Hale E. Sheppard, Evolution of the FBAR: Where We Were, Where We Are, and Why It Matters,
7 Hous. Bus. & Tax L.J. 1, 3 (2006) .................................................................................. 5

Anand Sithian, "But the Americans Made Me Do It!" How United States v. UBS Makes the Case
for Executive Exhaustion, 25 Emory Int'l L. Rev. 681 (2011) ...................................................... 6

Danielle Ireland-Piper, Prosecutions of Extraterritorial Criminal Conduct and the Abuse of Rights
Doctrine, 9 Utrecht Law Review 68, 72 (2013)......................................................................... 10

Anthony J. Colangelo, Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the
Intersection of National and International Law, Harv. Int'l L. J. 121, 158 (2007) ..................................... 31

## DEFENDANT STEFAN BUCK'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT

### PRELIMINARY STATEMENT

Defendant Stefan Buck is a citizen and resident of Switzerland. At all relevant times, he worked as a relationship manager in Bank Frey in Zurich.[1] As a Swiss citizen and resident, and as a Bank Frey employee, Buck was obligated to follow Swiss law, the regulations of the Swiss Financial Market Authority (FINMA), the body regulating banks and banking in Switzerland, and the policies of his employer. He meticulously followed all of them.

Nonetheless, the United States seeks to hold this Swiss citizen with no connection to the United States responsible for the fact that U.S. citizens have apparently evaded their responsibilities to fully pay their U.S. taxes. While the U.S. has made it routine over the last decade to charge Swiss banks and bankers with U.S. tax crimes, and has collected about $1.4 billion dollars in fines through "the Swiss bank program," the constitutional and statutory foundation for this legal edifice has never been tested by a United States court.

It also bears emphasis at the outset that Stefan Buck did not create or control any of the policies at issue in this case. Specifically, he did not create or control the Swiss law of bank client confidentiality (also known as "bank secrecy"), nor bank policy in regard to U.S. accounts, nor did he determine which accounts the bank would open and maintain, and which it would not. Rather, he followed directives – the directives of the bank, of his country's regulator (FINMA) as well as the requirements of Swiss law. He finds himself in a U.S. Courtroom because as a Bank Frey relationship manager he had direct face-to-face contact with the clients, and because he voluntarily boarded an airplane and came to New York to face these charges.

---

[1] In October of 2013, Bank Frey relinquished its Swiss banking license and ceased operations as a bank.

Stefan Buck submits this memorandum of law in support of his motions to dismiss the Indictment on the following five grounds.

First, that part of the charge relating to a conspiracy to defraud the United States is unconstitutionally vague as applied to the facts of this case.

Second, the U.S. statutes underlying this prosecution do not clearly apply to the solely extraterritorial conduct committed by Buck here.

Third, extraterritorial application of the conspiracy offense would conflict with the Swiss law of bank client confidentiality regarding conduct occurring solely on Swiss soil.

Fourth, under the particular facts here, Buck did not have "fair notice" that his conduct was illegal in the United States, nor is there a "sufficient nexus" between his particular conduct and the United States.

Fifth, that because the U.S. Government reached over 80 Non-Prosecution Agreements with Swiss banks whose conduct was comparable if not worse than Buck's, this case should be dismissed as a matter of fundamental fairness.

BACKGROUND

1.   <u>Swiss Law and United States Efforts to Collect Taxes on Overseas Income</u>

    A.   <u>The Centuries-Old Tradition and 83 Year Old Law of Bank Client Confidentiality</u>

The germ of this case, as with all Swiss bank cases, is a concept deeply ingrained in Swiss culture and identity: personal finances are private and should be confidential.  The Swiss law on bank client confidentiality[2] and the general right to privacy in one's personal and financial affairs from which it flows "reach(es) back into the traditions of the Middle Ages."

---

[2]The Swiss law is known as Bankkundengeheimnis, which is roughly translated from the German as "bank client confidentiality statute."  As described, the statute is designed to protect the privacy of bank customers.

Comment, Secret Swiss Bank Accounts: Uses, Abuses, and Attempts at Control, 39 Fordham L.

Rev. 500, 501 (1971) (hereinafter "Fordham Law Review").  "The main reason why Swiss law

protects bank secrecy so strictly is that the Swiss consider the secrecy of their private affairs as

an aspect of personal liberty which they wish to preserve."  Friedrich, The Anonymous Bank

Account in Switzerland, Journal of Business Law, 18 (1962)(hereinafter "Friedrich").  This

principle manifested itself in an obligation on the part of Swiss bankers dating to the 16th

century to maintain the confidentiality of the persons whose money the bank held.  Mueller, The

Swiss Banking Secret, 18 Int'l & Comp. L.Q., 360, 361 (1969).

Commentators have observed that the Swiss tradition of bank client confidentiality is

consistent with the development of Switzerland as a nation because "(i)n the loose cantonal

federation of Switzerland there was no such thing as national or public money.  Once money

was issued the Government retained no further control over it."  Fordham Law Review, at p.

502; see also Friedrich, at p. 15, 18.   Given the Swiss Government's passive role over money

and banking, it became the responsibility of the bank itself to ensure the security of the money it

held.  The bank's only tool in this regard was ensuring the privacy of the account-holder.  After

all, a bank cannot pass legislation or punish wrongdoers, as could a Government; therefore, it

resorted to the only meaningful safeguard available to it: privacy.

This tradition functioned effectively in an unwritten form until the early 1930s.  At that

time, the "Gestapo of Nazi Germany was surreptitiously attempting to probe into the records of

Swiss banks to see if certain 'enemies of the state' were violating German law by removing

their funds from the country and secreting them in the privacy of anonymous Swiss accounts."

Fordham Law Review, at p. 502-3, quoting Mueller at p. 361.  In order to be able to criminally

punish bankers for violating Swiss bank client confidentiality for the benefit of the Nazis or

anyone else, Switzerland passed in 1934 a criminal statute to ensure the sanctity of bank clients. The statute provides, in relevant part, as follows:

> Whoever divulges a secret entrusted to him in his capacity as officer, employee, mandatory, liquidator or commissioner of a bank, …shall be punished by a prison term not to exceed 6 months or by a fine not exceeding 50,000 francs….The violation of professional secrecy remains punishable even after the termination of the official or employment relationship…

Federal Law Relating to Banks and Savings Banks, Recueil Systematique Du Droit Federal, 952.0, art 47. See also Aubert, The Limits of Swiss Banking Secrecy Under Domestic and International Law, 2 Int'l Tax & Bus L. 273, 274 (1984).

This criminal statute applies to all bankers and bank personnel in Switzerland. Buck had no choice but to follow the laws of Switzerland.[3] When Buck (or any Swiss banker) offered a "hold mail" option to a client, for instance, this was not Buck's idea or plan or design to assist someone evade a tax obligation. Rather, it was nothing more than a single bank employee following decades of law and tradition.   Clearly then, bank client confidentiality was not created as a vehicle to assist U.S. tax evaders, and was firmly on the books of Switzerland long before U.S. tax evasion became an issue.

B.       Early U.S. Investigations Focused on the U.S. Taxpayer

The United States has spent the last fifty years trying to develop a solution to the dilemma of collecting tax on income generated overseas by U.S. persons.  A brief review of these efforts shows that for the first forty or so years of enforcement, the U.S. focused

---

[3] There are established rules setting forth how, and under what circumstances, an authority outside of Switzerland may acquire confidential Swiss bank information. However, rather than the U.S. Government pursuing information through the established channels, it instead charged Buck with a U.S. crime, in part, because he did not take it upon himself to disclose this information.

exclusively on the party ultimately responsible for this conduct: the non-compliant U.S.

taxpayer.

One of the first criminal tax investigations in this area was conducted by the New York

regional office of the IRS in 1958.  Fordham Law Review at p. 505.  The U.S. Congress then

conducted investigations in the late 1960s, focusing on three areas of abuse: money laundering,

illegal tax evasion and trading in U.S. securities without oversight of the U.S. securities laws.

Hearings on H.R. 15073.[4]  However, the U.S. treated these transgressions by Americans solely

as a domestic law enforcement problem, and endeavored to create record-keeping requirements

so that the U.S. authorities could keep track of Americans with foreign bank accounts.

Specifically, "in 1970, Congress enacted the Bank Secrecy Act...The purpose of the ... Act was

to require the filing of reports and the retention of records," including the FBAR.  Hale E.

Sheppard, Evolution of the FBAR: Where We Were, Where We Are, and Why It Matters, 7

Hous. Bus. & Tax L.J. 1, 3 (2006).  As a result, since 1970, U.S. citizens, resident aliens and

legal permanent residents who had a financial interest in, or signature authority over, a financial

account in a foreign country with an aggregate value of over $10,000 at any time in a particular

year were required to file with the Treasury Department an FBAR form.  There was no

corresponding reporting responsibility on a foreign bank or on anyone aside from the U.S.

taxpayer.

C.     The Qualified Intermediary Program and a Change of Focus

The focus of regulation and tax enforcement shifted to parties other than the U.S.

taxpayer through the Qualified Intermediary (QI) program.  The QI program was created by the

---

[4] The U.S. Attorney for the S.D.N.Y. at the time, Robert Morgenthau, set forth several cases pursued by his office in the 1960s that focused on the use of Swiss accounts, Liechtenstein Trusts, and securities transactions conducted abroad by Americans in order to evade, or possibly evade, the applicability of U.S. law.  Hearings on H.R. 15073.

U.S. Internal Revenue Service in 2000 and went into effect in 2001.  Foreign banks participating

in the program – and Bank Frey did so participate – agreed to (a) disclose the name of each

beneficial owner of an account holding U.S. securities, or (b) if the U.S. beneficial owner

refused, in accordance with foreign law, to authorize such disclosure, to apply backup

withholding of 31% on interest, dividends and sale proceeds from U.S. investments.  The QI

program did not require Swiss banks to report or engage in backup withholding for foreign-

source income unless that income was paid within the U.S. or to a U.S. account.

Having been promulgated by the IRS, the QI agreement was believed to set forth the

complete legal relationship between Swiss banks and the U.S. tax authorities.  There is no

dispute that Bank Frey was in compliance with the QI agreement between it and the U.S.

Government, as evidenced by the regular QI audits that were conducted.  Moreover, there is no

suggestion in the Indictment that the Bank or any representative were not in compliance.

D.  The U.S. Implicates Swiss Banks, Bankers and External Asset Managers

Within the last decade, the U.S. transitioned to focusing on Swiss banks and external

asset managers[5] as criminally-responsible parties.[6]  The core of the Government's theory is that

Swiss banks are required to determine whether its U.S. customers are tax-compliant, and further

required to discharge them if they are not.  However, this is a requirement that the United States

is placing on another nation's banks that it is not placing on U.S. banks.  Regardless, the U.S.

has used its influence, and that of the U.S. dollar as the world's currency, to impose its will on

the banks and bankers of Switzerland.

---

[5] External Asset Managers are private entities or persons not associated with a bank that provide
financial services including investment advice.

[6] For a discussion of the history of the prosecution of UBS, see Anand Sithian, "But the
Americans Made Me Do It!" How United States v. UBS Makes the Case for Executive
Exhaustion, 25 Emory Int'l L. Rev. 681 (2011).

U.S. enforcement efforts were at first limited to those Swiss banks (such as UBS) with a strong presence in the United States.  While the UBS prosecution was ground-breaking, it did not present the same legal issues concerning (i) the extraterritorial applicability of U.S. statutes, and (ii) Fifth Amendment due process as does the prosecution of a solely Swiss bank.  As a result, even following the UBS prosecution, many people in Switzerland, including the Board of Directors of Bank Frey, believed that as a Swiss-only bank, Bank Frey was not within the scope of the U.S. tax laws.

On February 2, 2012, the Swiss-only bank, Wegelin was indicted on U.S. tax offenses. However, according to the U.S. press release and the Indictment[7], the Wegelin situation appeared to be distinct because Wegelin was said to be involved in affirmative conduct, including the falsification of records,[8] to assist U.S. taxpayers.

In sum, what started as straightforward tax investigations of U.S. taxpayers changed over the past half-century to focus first on Swiss banks with a strong U.S. presence such as UBS and then again to Swiss banks without any U.S. presence, such as Bank Frey.  Along the way, the Government stopped distinguishing between active, purposeful, deceitful evasion, on the one hand, and the non-purposeful, non-deceitful protocols established by Swiss banks as a natural consequence of Swiss law.

---

[7] United States v. Wegelin & Co., et al., 12 Cr. 02 (JSR).
[8] The U.S. Attorney's press release indicated that Wegelin personnel maintained documents that falsely declared that the sham entities were the beneficial owners of certain accounts when they were actually owned by U.S. tax payers.  The press release also said the Wegelin personnel used their personal emails, instead of bank emails, to assist U.S. taxpayers evade IRS detection.  See Department of Justice Press Release, "Swiss Bank Indicted on U.S. Tax Charges," February 2, 2012.

2.    <u>Bank Frey and Stefan Buck</u>

    A.    <u>Brief Background on Bank Frey</u>

Bank Frey was founded in 2001.  It was originally called First Zurich Private Bank and

in 2004, changed its name to Bank Frey.  Throughout its existence, the bank had a single office

located in Zurich.  At no time did the bank have any physical presence in the United States.

The bank was run by a five-member Board of Directors.  The Board of Directors

determined business strategies and policies, had financial oversight over operations, and made

overarching business decisions for the bank.  The bank's day-to-day affairs were managed by

the Executive Board, which implemented the policies and protocols set by the Board of

Directors, including the cross-border business.

The bank adopted a philosophy that it could legally and appropriately service U.S.

persons so long as it did not engage in the activity for which other banks and bankers had gotten

into trouble with U.S. law enforcement.  Accordingly, the bank avoided five such activities:

    (1) having a presence in the U.S., marketing directly in the U.S. or sending bank

    employees to the U.S. to generate business;

    (2) advertising the bank's services as a way to hide assets;

    (3) engaging actively in activities that would mislead the IRS;

    (4) providing tax advice to bank clients; and

    (5) assisting clients in the construction of business or financial structures to evade taxes.

The bank hierarchy counseled younger employees, such as Mr. Buck, that so long as

these five activities were avoided, a Swiss-based bank, such as Bank Frey, could legally and

appropriately service U.S. clients.  In fact, after the indictment here, the Bank conducted an

examination of Buck's activities and concluded that he acted at all times within the purview of

8

his employment and consistent with the Bank's policies.   Also, as discussed below, FINMA

conducted an examination in 2013 and concluded that Buck followed Bank procedures and the

direction of his superiors.

### B.    Buck's Career At Bank Frey

In mid-2007, Stefan Buck, at age 26, began working at Bank Frey.  Aside from a job

associated with his father's insurance company for a little over a year, it was his first real job.

His initial assignment was to develop an insurance product for potential use by the bank.  This

assignment ultimately proved to be unsuccessful.  However, toward the end of 2007, Buck was

offered and accepted a job as a relationship manager of the bank.  His job was to service the

accounts of the bank's clients at the time; he was not expected to bring in clients or to generate

business.  Toward the end of 2007, when Buck became a relationship manager, the number of

U.S. customers was small – somewhere between 10 and 40.  Buck was never a member of the

Board of Directors.  He became a member of the bank's lower-level managing entity, the

Executive Board, in December of 2012.  He served on the Executive Board for five months

before the Indictment was filed in this case.

### C.    The Bank's Swiss-Only Philosophy

As with all Swiss banks, Bank Frey had rigorous "Know Your Customer" (KYC)

provisions that required the bank to ensure that no customer was using the bank's services to

hide the source or ownership of illicit funds.  The prevention of money laundering has

historically been the greatest concern of the Swiss banking industry.  Buck was advised by his

superiors at the bank that because Bank Frey did not have a presence in the U.S., nor did it

market its services in the U.S. or to U.S. persons, the bank was not subject to the tax laws of the

U.S.  Moreover, the view was that because banks like UBS, Credit Suisse or certain other large

banks did have a presence – often a significant one – in the U.S., and clearly marketed to U.S. persons, these larger banks may be subject to U.S. tax laws whereas the "Swiss only" banks such as Bank Frey were not.

This view adopted by the bank was certainly reasonable given traditional rules of international law, principally the rule of territoriality.  Simply put, "the territoriality principle is the most common basis of jurisdiction and is widely regarded as a manifestation of state sovereignty....The territoriality principle denotes that a state has jurisdiction over conduct that occurs within territorial borders."  Danielle Ireland-Piper, Prosecutions of Extraterritorial Criminal Conduct and the Abuse of Rights Doctrine, 9 Utrecht Law Review 68, 72 (2013). Because Bank Frey did not have any presence whatsoever in the U.S., and existed solely as a single office in Zurich, the bank and its employees operated on the belief that they were subject only to the laws of Switzerland, the country of their creation and existence.

D.     Structures as Clients of the Bank

As with U.S. Banks, Swiss banks accept banking clients who are natural persons or which are entities.  Those entities which seek Swiss banking services are often referred to as structures.  These structures can come in different forms: trusts, corporations, foundations, etc. What's more, the structures can be somewhat different based on the place of their creation.  Just like a Delaware corporation may differ from a New York corporation, a Liechtenstein foundation may differ from one created elsewhere.  Because the Government emphasizes the roles of these structures in its fraud theory, we hope to give the Court greater background on these structures, the roles they play in Swiss banking, and how they are treated as clients of a Swiss bank.

Swiss law is clear that where the client of a bank is a structure – whether it be a trust[9], a foundation[10], a corporation or some other legally recognized entity, the bank may communicate only with the legal representative of that structure. In the event of a trust, the bank may communicate only with the trustee; in the event of a foundation, the bank may communicate only with the foundation counsel. The bank legally may not communicate with any other person or party, even if that person is connected to, or the source of, the entity's funding.[11] In this regard, the U.S. client, or in the case of a structure, its legal representative, or an external asset manager had complete control over whether the client of the bank was a structure or a natural person. On the contrary, Buck had no control over how the account came to him.

Moreover, if the client was a structure, Buck had no discretion concerning who his client was, and with whom he could communicate: he was legally compelled to communicate only with the representative of the structure, unless of course that client allowed him to communicate with others. So, while it may be illegal for the creator of a structure to do so solely to hide U.S. assets, that liability should not transfer to the banker opening the account, who is under a legal obligation to follow Swiss law in his dealings.

---

[9] The traditional Anglo-Saxon common law trust (a three-party relationship between the settler who establishes the trust, the trustee who manages the assets, and the beneficiary who stands to benefit from the trust's assets) is not provided for under Swiss law and there are no Swiss trusts. However, under the Hague Trust Convention (HTC), Switzerland is obligated to recognize the existence and legal efficacy of foreign trusts, and it does so.

[10] A foundation is created by endowing assets for a particular purpose. Unlike a trust, a foundation has an independent legal existence and is subject to taxation. Many foundations are created under the laws of Liechtenstein specifically because that country's laws allow the founder to reserve certain rights to alter the rules concerning the foundation's assets.

[11] Decisions of the Federal Supreme Court of Switzerland provide that the bank enters into a legal relationship solely with it co-contractant – the person or entity with which the contract was reached. BGE 100 II 200 recital 9.

E.     The Swiss Financial Market Authority (FINMA)

It is significant in determining whether Buck is criminally liable that he did not violate

the rules of the body charged with regulating his conduct as a Swiss banker based in

Switzerland.  That body is known as FINMA, and a short discussion about it is necessary.

Pursuant to Article 6 of the Swiss Financial Market Supervisory Act (FINMASA),

FINMA supervises the financial markets and all banks in Switzerland. Prior to October 22,

2010, FINMA provided no guidance to Swiss banks in regard to cross-border businesses.

On October 22, 2010, FINMA issued a position paper (a policy pronouncement that is

not legally-binding) on legal risks.  Ex. 1.  In discussing tax and criminal law, FINMA stated the

following:

> From a tax and criminal law perspective, there is the risk of financial intermediaries or
> their employees becoming party to tax offenses under foreign law committed by foreign
> clients (e.g. as an aider or abettor).  What constitutes assisting in the commission of an
> offense will be determined by applicable foreign law.  In some jurisdictions, criminal
> offenses can even include acts performed exclusively or largely outside the country, e.g.
> on Swiss territory.  Careful consideration must therefore be given to the range of
> services offered to foreign clients, and in particular the policy governing client visits,
> and appropriate guidelines must be laid down.  Some former employees of Swiss banks
> involved in cross-border transactions with U.S. clients and advisors to U.S. clients have
> been charged, among other things, with aiding and abetting in the commission of tax
> offenses.

FINMA then provided an example of the types of risk of which it was warning, and

stated as follows:

> A Swiss bank with U.S. branches is being investigated by various U.S. authorities.  The
> bank has been accused of breaching provisions of the U.S. securities law and tax law, as
> well as undertakings under the Qualified Intermediary Agreement (QIA), in transacting
> cross-border business with U.S. private clients.  In the course of the investigations, there
> have been increasing signs that individual client advisors had been helping high net
> worth U.S. clients to avoid disclosure and tax requirements arising from the QIA.  It
> appears that at the time of the introduction of the QI regime, these advisors created
> offshore structures for the clients in question where they could hold U.S. and non U.S.
> securities.  There is also evidence of breaches in U.S. securities law in connection with
> the supply of cross-border services to U.S. clients.

As is apparent from FINMA's 2010 position paper, FINMA did not view traditional Swiss banking ("hold mail," and other aspects of bank client confidentiality), as illegal under U.S. law in and of itself.  Rather, FINMA focused on client advisors creating off-shore structures for U.S. persons that could be used to hold U.S. and non-U.S. securities.  That FINMA engaged in this analysis in 2010 shows two things.  First, FINMA was linking its analysis with the requirements of the QI agreement because it focused specifically on the possibility of structures being used by U.S. persons to possibly hold U.S. securities, which would clearly be in violation of the QI agreement.  Second, FINMA was primarily concerned with active measures (i.e., the creation of structures) by bankers or external asset managers to affirmatively assist U.S. taxpayers in avoiding detection by the IRS.

By June of 2012, FINMA had begun to focus more sharply on the legal risks attendant to a Swiss bank's cross border business.  In a five-page publication on the topic of cross-border business (Ex. 2),  FINMA observed that "it is particularly important to establish whether and under what circumstances the foreign legal frameworks and the authorities charged with enforcing them view acts or omissions by financial institutions as aiding and abetting tax crimes."  Also, for the first time, FINMA acknowledged that activities "carried out in Switzerland" can lead to liability under foreign law.  FINMA placed responsibility for managing these risks squarely on "the body responsible for ultimate management, supervision and control" – specifically the Board of Directors.  It bears repeating that Buck never served on the Bank's Board of Directors.

Even in this sharply targeted publication, FINMA did not opine on the specific provisions of U.S. law that could lead to conspiratorial or aiding and abetting criminal liability on the part of Swiss bankers or banks.  The most it would say was that the laws of certain

foreign countries are different than those of Switzerland.  In particular, FINMA alluded to a Swiss legal precept that a bank is not legally responsible for the actions of an external client advisor[12], but that such may not be the case under foreign law.[13]

<u>STATEMENT OF FACTS</u>

The Indictment contains a detailed summary of the factual allegations concerning both Paltzer and Buck as they relate to six specific U.S. taxpayers.  Insofar as the specific facts are helpful in framing the legal arguments set forth in the Argument section of this Memorandum, they are set forth below.

1.   <u>Client One</u>

Client One was a U.S. citizen who was alleged to have had direct dealings with Edgar Paltzer but not with Stefan Buck.  In fact, it appears as though Client One never had an account at Bank Frey.

As alleged, Paltzer helped Client One transfer her assets from UBS to Bank Wegelin by using an off-the-shelf British Virgin Island corporation.  Paltzer then instructed the client that he would send her checks in amounts less than $10,000 to avoid the reporting requirement.  When communicating with Client One, Paltzer used coded language such as "rental income" to refer to the balance in her account.  While this is clearly affirmative action on the part of Paltzer specifically designed to aid in U.S. tax evasion, Buck is in no way involved in the conduct concerning Client One.

---

[12] FINMA stated specifically that the institution "should also consider the risk that foreign authorities may hold the institution liable for violations committed by the EAM (external asset manager) if – unlike Swiss law – the foreign legal system concerned does not distinguish in principle between he area of responsibility of the institution and that of the EAM.
[13] Certain of FINMA's reports and correspondence are public while others are not.  Counsel believes that there are confidential, non-public reports and correspondence from FINMA that are relevant and exculpatory to the defendant – specifically in the context of a good faith defense – where FINMA concluded that Buck followed Bank policy and relied on his superiors..

2.    Client Two

Client Two is a U.S. person who dealt with Edgar Paltzer but not Stefan Buck.  In 2000,

Paltzer created a Panamanian corporation for the client[14] and made himself the President.

Paltzer then opened an account at a Swiss Bank (not Bank Frey).  Paltzer then frequently

withdrew large amounts of cash from the account and paid some of this back to the client.  In

2005, Paltzer directed Client Two to Bank Wegelin.  As the President of the Corporation

holding the account, Paltzer himself moved the funds to Bank Wegelin.  In 2010, Paltzer

destroyed records linking the account to Client Two when he and the client learned that an

account adviser had been charged with a crime.

As with Client One, Paltzer engaged in purposeful, directed conduct aimed at squarely

and actively helping Client Two to evade U.S. taxes.  Again, there is no allegation Buck was in

any way involved in this conduct.

3.    Client Three

In the early 2000's, Paltzer met Client Three[15], a U.S. person, and explained the benefits

of holding a Swiss bank account in the name of a trust.  Paltzer provided off-the-shelf trusts for

---

[14] The term "client" must be further understood.  The Indictment proceeds on the assumption
that the client is the U.S. beneficial owner.  However, this is untrue as a matter of Swiss law.
Under Swiss law, when a corporation, for instance, opens an account, the client is the
corporation, acting through its legal representatives.  In the case of "client two," the actual client
is the corporation, and since Paltzer made himself the President, he would be the person with
legal authority over the account.  There is nothing a bank can do to change this arrangement.  In
other words, the bank lacks the authority to dispense with the legal structure of corporation and
deal directly with the beneficial owner.  Therefore, by opening the account, the bank is not
making a choice to further the interests of the client or the beneficial owner.  Rather, the bank is
doing what it is obligated to do under the law.
[15] The person referred to in the Indictment as "Client 3" appears to be two people, with the
initials HK and YC.  Also, as noted elsewhere in this memorandum, neither of these persons
were  actually clients of the bank, as Paltzer created structures to hold the bank account and
made himself (Paltzer) the representative of the structures. This means that Paltzer controlled
the account.

the client, the client chose one called Daroka, and the funds in Swiss Bank No. 4 were transferred into the Daroka account.  See Ind. ¶¶ 21,22.

In about early 2009, Swiss Bank No. 4 decided to discontinue its cross border business. Paltzer then arranged the funds to be moved from Swiss Bank No. 4 to Bank Frey.  The Indictment alleges that Paltzer arranged with a member of Bank Frey's Board of Directors, who was also Paltzer's law partner, that Bank Frey would accept Client 3 (and others) as customers of Bank Frey.  Paltzer then opened accounts at Bank Frey in the names of Daroka Overseas Inc., and Edraith Invest and Finance Ltd.  Because Paltzer made himself the representatives of these entities, Paltzer controlled the accounts.  Buck typically had no business dealings with the U.S. beneficial owner during the client-relationship, as the U.S. beneficial owner was not a client of the bank.  Rather, Buck dealt with the representative of the duly recognized bank client, who was Paltzer.[16]

The Indictment alleges that in 2011, Client Three decided to close the Bank Frey accounts.  Paltzer then advised that the client could purchase jewelry to repatriate to the U.S. Accordingly, pursuant to Paltzer's instructions, funds were transferred from the Bank Frey account to another corporate account in Geneva, Switzerland.  Buck did not know that this corporate account was related to a jewelry business.  He knew only that Paltzer was arranging this payment order to close the account.  Also unbeknownst to Buck, the Swiss jeweler had a brother in New York who was also a jeweler.  Client Three purchased a significant amount of jewelry through the Swiss intermediary.  While Paltzer may have intended these jewelry

---

[16] Emails and witness testimony will show that Buck did not physically meet Paltzer until the middle of 2010, more than one and a half years after Paltzer opened the account.  Additionally, evidence will show that the two men were in the same place a total of less than five times. Paltzer was a powerful lawyer and had no need to spend time with Buck, who was far junior to him in age and stature.

transactions as a way of repatriating Client 4's funds, Buck had no way of knowing this.  First, Paltzer certainly did not inform Buck of his plan.  Second, the payment order authorizing the transaction did not indicate anything unusual.  On the contrary, it showed only a payment from the bank to another entity with a Swiss bank account.  At this point – when the funds leave the bank and are transferred to another Swiss account – Buck loses touch with the transaction. Paltzer explained the purpose of the payment order was that the funds were for a direct investment in real assets.   That Paltzer then apparently used these funds to buy diamonds as a way to repatriate this money to the U.S. is a fact only known by Paltzer and Client 3, but not by Buck.[17]

Paltzer's control of the account and Buck's legal obligation to follow Paltzer's direction is demonstrated by a series of emails in August of 2012.  In particular, on August 6, 2012, Buck wrote an email to Paltzer attaching a letter from an attorney on behalf of Client 3 (both HK and YC), requesting from Buck all account records for Client 3 or trust accounts where those persons were beneficial owners.  When Buck received this letter, he forwarded it to Paltzer, and wrote, in substance that he had received the attached letter and that Paltzer should let Buck know how proceed, and that without Paltzer's instructions, Buck could not proceed.  Paltzer responded by email later on the same day that due to Swiss banking secrecy, Buck is not allowed to give out any information and that Buck must respond accordingly.  Paltzer also directed Buck to provide to Paltzer the documentation the lawyers of Client 3 requested.

This exchange shows several important things.  First, Paltzer legally controls this account and Buck is legally obligated to follow his direction.  Second, Paltzer uses his superior

---

[17] The discovery corroborates that Buck was not involved in, or aware of, the jewelry transaction.  Rather, it is clear that Paltzer made these arrangements with Client 3 and Client 3's former banker, who organized the purchase of the diamonds.  The Indictment contains no facts to contradict this.

legal knowledge as a practicing attorney to remind Buck that under Swiss law, Buck is not permitted to release the information of the U.S. persons (Client 3).  Third, by creating these structures and making himself the principal, Paltzer has exclusive control over the flow of information.

Also, as a more general matter, as is the case with Clients One and Two, Paltzer is a critical strategic partner of Client Three in helping Client Three successfully evade U.S. tax authorities.  Paltzer is generating ideas and executing them in conjunction with, and on behalf of, the U.S. person.  Buck, on the other hand, is relegated to the merely ministerial role of a banker being told where to send funds and how to deal with outside requests.  Paltzer, on the other hand, is in complete control of every aspect of this situation, leaving Buck no discretion and no power to affect this account.

    4.    <u>Client Four</u>

In about 2009, Swiss Bank No. 6 informed Client 4 that it was closing his account. The client advisor at Swiss Bank No. 6 suggested that the client open an account at Bank Frey, and provided Buck's contact information.

On October 7, 2009, Client 4 drafted an email to Buck mentioning that RE from C.A. bank introduced them. On October 19, 2009, Client 4 wrote to Buck that he and his wife, "have always reported all income received from here and from other banks."  On December 8, 2009, Client 4 asked if Bank Frey uses encryption and whether the account statements could be referred to some other way.  Buck explained that the bank did not utilize encryption methods nor did it offer communication passwords, as requested by the U.S. person.

Client 4 states that he had a conversation with Buck in which Buck allegedly said "that in order to avoid the IRS discovering the account, (1) (Bank Frey) must have discretionary

authority over the account...(2) the account could not hold any U.S. securities, and (3) Client 4 and his wife should not conduct transfers in or out of the account in U.S. dollars, because such transfers would 'clear' in the United States and were therefore detectable." [18]  Ind. ¶ 29.  Client 4 further alleges that during another conversation, Buck "advised them to mark 'no' as to whether they required a tax statement. This question referred to only Swiss tax statements, which was the only type the Bank produced.  Because Client 4 was not obligated to pay Swiss tax, there was no reason to provide him a Swiss tax statement.  Rather, the client used the year-end and income statements to prepare the tax report.

The Indictment alleges that Client 4 and his wife opened an undeclared account at Bank Frey,[19] and later asked Buck to send funds to the United States. Between December 9, 2010 and July 11, 2011, 11 checks were sent, 10 of which were between $2,850 and $4,962, and one of which was $29,471 and drawn to a car dealership.  There is no indication that Buck chose the amounts or payee of these checks. In fact, Buck was doing nothing more than executing Client 4's instructions.  Client 4 stated to Buck that these checks were necessary to pay his living expenses, and there was no indication to the contrary.

As a final matter, there was a suggestion during the Vienna proffer of December 13, 2013 that Bank Frey used a Bank Wegelin correspondent account to disguise Bank Frey's

---

[18] Buck does not deny having this discussion.  However, this discussion did not relate to tax avoidance.  Rather, Buck informed the client that pursuant to Securities and Exchange Committee (SEC) regulations concerning investment advisors, Buck is not permitted to call the client or give the client investment advice which is why the bank would have discretion over the account; and that the policy of the bank prevented U.S.  persons from holding U.S. securities; and that the executed U.S. dollar checks on behalf  of the client clear in the U.S. just as any U.S. dollar transfer.

[19] As we have discussed at length, it is misleading to say that an undeclared account was opened at a bank.  Every account is undeclared at the time it is open.  In fact, under the law, an account may legally not be declared to the IRS for a year or more.  The most that can be said is that an account was open under indicia that led one to believe that it would likely not be declared at the proper time.  But, this is far from certain and not something in the banker's control.

connection to certain payments. Buck explained that Bank Wegelin was an outsourcing partner of Bank Frey, offering payment services such as a correspondent account for U.S. dollars or Euros. As a small bank, Bank Frey was unable to maintain these services on its own, and had to outsource these services to a larger bank, such as Wegelin.

5.    Client Five

In about May 2009, a client advisor at Swiss Bank No. 7 advised her that it was closing its U.S. accounts and that she should consider opening her account at Bank Frey. The client advisor said that because Bank Frey does not have a presence in the U.S., it does not have to make the disclosures that a Swiss bank with a U.S. presence must make.[20] Client Five met Buck, who allegedly said that "U.S. authorities did not have leverage over" Bank Frey. This alleged statement is consistent with the Bank's belief that it is subject only to Swiss law. However, to the extent that the Government includes this statement in the Indictment as evidence that Buck urged Client Five against disclosing the account, such is inconsistent with the fact that Buck helped approximately 130 clients voluntarily disclose their previously undeclared accounts.

6.    Client Six

In about 2008, a U.S. citizen inherited an undeclared account at Swiss Bank No. 7. The account was held in the name of Talcoria, S.A., a Panamanian corporation. The representative of the account was C.G.,[21] who created the corporation. While the Indictment states that the account of this Panamanian corporation was managed by an external asset manager, this does

---

[20] It is clear that as of at least 2009, many Swiss bankers believed the line between being lawful and unlawful under U.S. law was defined by whether the bank had a presence in the United States.

[21] Swiss criminal law prevents the use of the name of the account representative, C.G. and the trust or the trust administrator to the extent that they are clients of the bank. Therefore, they will be referred to by their initials.

not seem to be the case.  Rather, the person referred to as C.G. was a representative of the corporation itself, and not an external asset manager.  C.G. was the one who gave discretionary mandate to Bank Frey to manage the assets on his behalf.  Also, while the U.S. Government views Client 6 as the client of the bank, the client of the bank is the party that holds the account. Here, that is Talcoria, as represented by its legal representative, C.G., who, as noted, provided the mandate.  As a result, C.G. controlled this account.

In February 2009, C.G. and the Swiss Bank No. 7 client advisor informed Client 6 that the account was being transferred to Bank Frey.  C.G. and Client 6 then met with Stefan Buck. During the ensuing conversation, Buck allegedly told Client 6 that Client 6 does not need to reveal his account because Bank Frey operated only in Switzerland.[22]

7.   Comparison of Paltzer and Buck

Based solely on the specific allegations in the Indictment, therefore, a critical distinction must be drawn between the conduct of Paltzer and that of Buck.  While Paltzer actively created off-shore corporations, made himself an executive of such corporation and, accordingly, was able to make all decisions himself regarding the handling of the account, Buck is not alleged to have engaged in similar conduct.  Rather, Buck did nothing more than any of the other thousands of bankers did, and were obligated to do, under the law: he managed relationships with clients whose accounts had been accepted and opened by the bank's legal department and executive board.  He did not create structures, nor did he put himself into the place of the U.S. beneficial owner by making himself a corporate executive so as to effectively become the account holder.  Moreover, Buck did not provide tax advice, nor did he market his services in

---

[22] Buck denies saying this to Client 6.  In addition, it makes no sense that Buck would have said this because Buck himself made efforts to secure counsel for C.G., who controlled the account, so that this account could be voluntarily disclosed.

the United States or to U.S. persons, or engage in any artifice to affirmatively assist the U.S. tax payer to defraud the IRS.

On the contrary, the very facts in the Indictment make it clear that Paltzer used his station as a Swiss and United States lawyer to both create legal structures and make himself their executives. This made him the representative of beneficial owner, and gave him sole power to make all decisions on behalf of the account. Because of how Paltzer created these legal structures, Buck had no legal choice but to deal with Paltzer, as the client's representative. Also, it bears repeating that Paltzer was a highly-regarded lawyer trained in the U.S., licensed in New York, who exerted great authority over the far less experience and educated Stefan Buck.

<u>ARGUMENT</u>

<u>POINT ONE</u>

<u>THE "DEFRAUD THE UNITED STATES" OBJECT OF THE CONSPIRACY OFFENSE IS UNCONSTITUTIONALLY VAGUE</u>

The Indictment charges Buck with a tri-object conspiracy: (1) to defraud the U.S., specifically, the IRS; (2) to commit an offense against the United States of attempted tax evasion (26 U.S.C. § 7201), and (3) to commit an offense against the United States of false declaration in connection with a tax return (26 U.S.C. § 7206). <u>See</u> Ind. ¶ 87.

In describing the conspiracy, the Indictment states as follows:

From at least in or about 2000 through in or about at least 2012, EDGAR PALTZER and STEFAN BUCK, the defendants, conspired with various U.S. taxpayers, and others known and unknown, to ensure that their U.S. taxpayer clients could hide the U.S. taxpayers' Swiss bank accounts and the income generated in those accounts, from the taxation authority of the United States, the Internal Revenue Service (the "IRS"), via false and fraudulent federal income tax returns

Ind. ¶ 13.

Buck is charged with violating Title 18, United States Code, Section 371, which provides in relevant part that "(i)f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose" such person is guilty of a felony. Id. The statute has two prongs.

The first is that two or more people conspire to commit an offense against the United States. As noted, Buck is charged with conspiring to commit the two tax offenses of attempted tax evasion and false declaration on a tax return.

The second prong of the statute involves defrauding "the United States, or any agency thereof (here, the IRS) in any manner or for any purpose." Buck is charged with this prong of the statute as well.

As applied to the facts here, the "defraud the United States" object of the conspiracy is unconstitutionally vague. "To satisfy due process, 'a penal statute (must) define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." Skilling v. United States, 561 U.S. 358, 364 (2010) quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983).

There is no doubt that the language of the Section 371 defraud clause, prohibiting conspiracy to "defraud the United States, or any agency thereof in any manner or for any purpose," is extremely broad. However, Supreme Court decisions indicate that such broad language must be limited to "plainly and unmistakably" criminal conduct. See United States v. Gradwell, 243 U.S. 476, 485 (1917); see generally Skilling, 561 U.S. at 364.

In this regard, convictions have been reversed where, as here, the defendant's conduct was not "plainly and unmistakably" within the purview of the defraud provision. In a seminal

23

decision limiting the "defraud" provision, the Supreme Court in <u>Hammerschmidt v. United States</u>, 265 U.S. 182, 185-6 (1924), reversed convictions under the clause where defendants advocated for disobeying the Selective Service Act.  The Court noted, "a mere open defiance of the governmental purpose to enforce a law by urging persons subject to it to disobey it" is not "within the legal definition of a conspiracy to defraud the United States."   <u>Id.</u> at 189.

In <u>United States v. Gradwell</u>, the Supreme Court found that the defraud provision did not reach an alleged election fraud scheme where defendants purportedly arranged for unqualified voters to vote, and vote more than one time.  243 U.S. at 478.  The Court stated simply that this type of election fraud was not "plainly and unmistakably" prohibited by the statute.

The case generally cited by the Government to establish the broad applicability of the defraud provision is <u>United States v. Klein</u>, 247 F.2d 908 (2d Cir. 1957).  However, the facts of <u>Klein</u> are distinct, and in fact support Buck's arguments concerning the law.  In <u>Klein</u>, the Second Circuit found that Klein, a U.S. tax payer, and his two lawyers, Alprin and Haas, conspired to defraud the United States.  Significantly, each of the three defendants was involved in directly lying to Treasury officials in a joint effort to keep the officials from learning the truth about Klein's whiskey business and taxes he owed to the U.S.  The case stands for the self-evident proposition that by lying directly to Treasury officials in order to falsely minimize a client's tax obligation, the lawyer can be guilty of conspiracy.  In <u>United States v. Coplan</u>, 703 F.3d 46 (2d Cir. 2012), the Second Circuit examined the contours of the so-called <u>Klein</u> conspiracy in a case involving tax shelters created by the accounting firm Ernst & Young specifically targeting clients looking to shelter $20 million or more.  The Second Circuit reversed the conspiracy convictions of two of the defendants in the <u>Coplan</u> case – Shapiro and

Nissenbaum – because there was insufficient evidence that they had lied, coached another to lie, or otherwise provided misleading information about a tax shelter at issue.

The crux of these decisions is that Klein conspiratorial liability is limited to those conspirators who themselves lie to, or engage in purposely deceptive conduct toward, the U.S. or an agency such as the IRS.  In the instant case, the Government does not allege that Buck engaged in the requisite deceit toward the U.S., nor does it allege that Buck engaged in purposeful, directed action with the specific intent to defraud the U.S.  Specifically, there is no allegation that Buck made a false statement – either verbally or in writing, nor that he provided ideas or means by which a U.S. taxpayer could evade the IRS, nor that he did anything affirmative to actively aid, or conspire with, U.S. tax payers in any regard.

By looking to extend criminal liability to Mr. Buck given these allegations, the Government seeks to criminalize a broad array of conduct encompassing all activities engaged in by Swiss bankers who follow Swiss law.  As interpreted and charged by the Government in this case against Buck, criminal liability under Section 371's "defraud" provision would extend to every Swiss banker who, while abiding by the Swiss criminal law of bank secrecy, opened and maintained a bank account for a U.S. person.  By opening such account, and by abiding by the Swiss law in administering the account, the Swiss banker is "ensur(ing)" that U.S. taxpayers could hide" accounts and money, and under the theory charged here, would be a co-conspirator with a U.S. taxpayer who failed to declare, or pay taxes on, his or her income.[23]

---

[23] If the court is not inclined to dismiss the "defraud the United States" object of the conspiracy offense on this basis, as a secondary request, we ask that the Court narrowly interpret this provision to criminalize only that conduct that is directly deceitful, purposeful and specifically-focused at U.S. tax evasion.

Because the "defraud the United States" object of the charged conspiracy lacks sufficient definiteness and permits arbitrary and discriminatory enforcement, it is unconstitutionally vague and should be dismissed.

POINT TWO

THE CHARGED CONSPIRACY DOES NOT APPLY EXTRATERRITORIALLY

In order for the charged Section 371 Conspiracy offense to apply to Buck's conduct, which took place wholly in Switzerland, this Court would have to find that Congress specifically intended it to apply to extraterritorial conduct.  The Supreme Court has held as a "canon of statutory interpretation" that, "when a statute gives no clear indication of an extraterritorial application, it has none." Kiobel v. Royal Dutch Petroleum Co, __ U.S. __, 133 S.Ct. 1659, 1664 (2013) quoting Morrison v. National Australia Bank Ltd, 561 U.S. 247, 255 (2010).  "It is a 'longtime principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" Morrison, 561 U.S. at 255, quoting EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991).  This cannon of construction "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." Morrison, 561 U.S. at 255, quoting Smith v. United States, 507 U.S. 197, 204 (1993).   Moreover, this cannon of construction "reflects the presumption that United States law governs domestically but does not rule the world." Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454 (2007).

In this case, the conspiracy offense has three objects, any one of which alone could substantiate the conspiracy.  Therefore an analysis must be done of congressional intent of each of the three objects.  In regard to the extraterritoriality of a Section 371 Conspiracy, courts have held that "the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy

is coterminous with that of the underlying criminal statute." United States v. Ali, 718 F.3d 929 (D.C. Cir. 2013); see also United States v. Mardirossian, 818 F.Supp.2d 775 (S.D.N.Y. 2011). This would mean that the two objects of the conspiracy related to offenses against the United States would be analyzed for extraterritorial applicability based on the specific object-offenses.

1.  Extraterritorial Applicability of The Tax Evasion Provision (Sec 7201) and False Declaration Provision (Sec. 7206) of Title 26

The tax evasion provision makes it unlawful to "willfully attempt[ ] in any manner to evade or defeat any tax." 26 U.S.C. § 7201.  This statute does not contain any language indicating it applies to extraterritorial conduct.

The false declaration provision makes it unlawful to make false statements on a tax return.  2 U.S.C. § 7206(1).  Likewise, this statute does not contain any language indicating it applies to extraterritorial conduct.

Defendant Buck asserts that this Court need proceed no further.  The guidance provided to District and Appellate Courts by the Supreme Court in Morrison, 561 U.S. at 255, EEOC v. Arabian American Oil Co., 499 U.S. at 244, is clear: legislation applies only domestically unless there is clear contrary intent expressed by Congress.  Accordingly, in the absence of clear intent on the part of Congress to apply these tax statutes to conduct taking place wholly in Switzerland by a Swiss citizen and resident, the judiciary should not, most respectfully, find extraterritorial applicability when Congress has not provided for it.   When Congress wants to apply a statute extraterritorially, it makes such intent manifestly clear.[24]

---

[24]For example, the Maritime Drug Law Enforcement Act (MDLEA) makes it a crime to "knowingly and intentionally manufacture or distribute or possess with intent to distribute a controlled substance on board,"….a vessel subject to the jurisdiction of the United States….which includes a vessel without nationality."  United States v. Ballestas, 795 F.3d 138 (D.C. Cir. 2015).

That neither statute purports to apply to extraterritorial conduct follows logically from the nature of the activity the statutes proscribe. Plainly, the collection of income tax from U.S. persons is a domestic concern. Unlike certain statutes that logically would apply to extraterritorial conduct, such as for example Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B, see United States v. Kassar, 660 F.3d 108 (2d Cir. 2011), the obligation to accurately disclose and pay income tax does not apply to non-resident aliens involved in business solely outside the United States. Therefore, it follows logically that the tax offenses charged as part of the conspiracy do not apply extraterritorially.

To be clear, we do not dispute that the statutes would apply to a United States citizen residing abroad. Because the subject in this example is a U.S. citizen, this would not be an extraterritorial application of the statute. However, where, as here, the Government is asserting that the U.S. tax statutes reach a Swiss citizen and resident who has no connection whatsoever to the U.S. and who worked for a bank having no presence in the U.S., this is a clear extraterritorial application. Because such is not clearly provided for by Congress, this application of the two tax statutes to Buck may not apply.

2.  Extraterritorial Applicability of the "Defraud The United States" Provision

Unlike the two tax statutes charged as object crimes of the conspiracy, the "defraud the United States" provision is not predicated on another federal crime. This presents a special problem with this provision because as courts have held, "the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute." Ali, 718 F.3d at 929; Mardirossian, 818 F.Supp.2d at 775. Because there is no ancillary or predicate offense, the question becomes whether Section 371 in

and of itself, without regard to any other statute, has been given clear extraterritorial reach by Congress.

As with the two tax offenses charged as object-crimes, there is no clear legislative intent to apply the "defraud the United States" provision of Section 371 extraterritorially.  Moreover, the defense is aware of no decision indicating that Section 371 has been given clear extraterritorial applicability in regard to its second clause relating to a conspiracy to defraud the U.S.  Given the fact that there is a historically-recognized presumption that "United States law governs domestically but does not rule the world," United States v. Vilar, 729 F.3d 62, 72 (2d Cir. 2013), the lack of clear intent by congress to apply the second clause of Section 371 to conduct committed abroad means that the statute does not apply to Buck's conduct here.

A second issue is whether a so-called Klein conspiracy (the violation of the "defraud the United States" provision of Section 371) is a creation of Congress at all, or rather a judicially-created doctrine.  As the Second Circuit stated, the "Government …appears implicitly to concede that the Klein conspiracy is a common law crime, created by the courts rather than by Congress.  That fact alone warrants considerable judicial skepticism." Coplan, 703 F.3d at 61. The question then becomes how Congress can give extraterritorial applicability to a statute it never created?  The answer is that it cannot and that it did not.

Because the Section 371 offense, as charged here, does not apply extraterritorially, this prosecution cannot be sustained.

POINT THREE

EXTRATERRITORIAL APPLICATION OF THE CONSPIRACY OFFENSE
WOULD CONFLICT WITH THE SWISS LAW OF BANK CLIENT
CONFIDENTIALITY

The Supreme Court has stated that the presumption against extraterritorial application of

U.S. laws "serves to protect against unintended clashes between our laws and those of other

nations which could result in international discord." Kiobel v. Royal Dutch Petroleum Co, __

U.S. __, 133 S.Ct. 1659, 1664 (2013) quoting EEOC v. Arabian American Oil Co., 499 U.S. at

248.  Just as the Supreme Court counsels that statutes should be interpreted so as to avoid, if

possible, the conclusion that they are unconstitutional, see Almendarez-Torres v. United States,

523 U.S. 224, 237 (1998), it also counsels that U.S. statutes should be interpreted so as to avoid

conflicting with the laws of other nations.

This cannon of statutory interpretation is almost as old as our nation.  In Murray v.

Schooner Charming Betsy, 6 U.S. 64, 64 (1804), Chief Justice John Marshall stated that "an act

of Congress ought never to be construed to violate the law of nations if any other possible

construction remains." Id. at 118.[25]  This rule of statutory interpretation is set forth in the

Restatement (Third) of the Foreign Relations Law of the United States, which provides that a

state "may not exercise jurisdiction to prescribe law with respect to a person or activity having

connections with another state when the exercise of such jurisdiction is unreasonable." Id., Sec.

403(1).

Applying the U.S. conspiracy charge to Buck, under these facts, would create a clear

conflict between the U.S. law and the Swiss law of bank secrecy.  As set forth in the allegations

---

[25] Proof that the Charming Betsy doctrine retains its vitality is the fact that 209 years after Chief
Justice Marshall's holding, the D.C. Circuit in United States v. Ali, 718 F.3d 929 (D.C. Cir.
2013), explicitly referred to the "Charming Betsy cannon" in the context of a case involving
piracy.

of the Indictment, Buck did nothing more than what every Swiss banker did under the law of bank secrecy. For instance, the Government alleges that Buck informed U.S. customers that he was not legally permitted to disclose their account at the bank. The Government further alleges that this is an act in furtherance of the charged conspiracy. However, it is also an act that is absolutely required by, and consistent with, the Swiss law of bank secrecy. In fact, if Buck did disclose the name of the account holder, he would be guilty of a crime in Switzerland. In this regard, and many others, the charged offense as applied to Buck is in clear conflict with Swiss law.

As a matter of statutory interpretation, under the Charming Betsy cannon as well as more recent Supreme Court decisions such as Kiobel, __ U.S. __, 133 S.Ct. at 1664 (2013) and EEOC v. Arabian American Oil Co., 499 U.S. at 248, defendant moves this Court to narrowly interpret the scope of the charged conspiracy to preclude application to Swiss bankers such as Buck. Accordingly, we ask that the conspiracy charge be dismissed.

POINT FOUR

BUCK LACKED FAIR NOTICE THAT THIS CONDUCT WAS ILLEGAL;<br>ALSO, THERE IS NOT A SUFFICIENT NEXUS BETWEEN BUCK'S<br>CONDUCT AND THE UNITED STATES

Even if the Court finds that Section 371 applies extraterritorially to Buck's conduct as a banker in Switzerland, there are two separate but related Fifth Amendment Due Process principles that nonetheless preclude this prosecution on constitutional grounds. "Unlike structural limitations on extraterritorial jurisdiction which determine Congress' power to legislate in the first instance, Fifth Amendment due process limits profess to insulate individual defendants from the application of an otherwise valid legislative enactment." Anthony J. Colangelo, Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection

31

of National and International Law, Harv. Int'l L. J. 121, 158 (2007).   The two Fifth Amendment

Due Process grounds that preclude this prosecution are (1) that Buck lacked fair notice that his

particular conduct was unlawful in the United States; and (2) that there is an insufficient

constitutional nexus between Buck's conduct and the U.S. given the facts alleged in the

Indictment.  See United States v. Yousef, 327 F.3d 56 (2d Cir. 2003).

     1.    Lack of Fair Notice

An examination of the issue of fair notice begins with the reality that there is no judicial

decision supporting the Government's theory of prosecution in this case.  In addition, Buck's

conduct is altogether legal and appropriate from a regulatory perspective in his home country of

Switzerland.  There is no allegation, nor could there be, that Buck violated Bank Frey policy, or

that he violated FINMA regulations or that he broke a Swiss law.   In fact, he would have

broken the Swiss law had he complied with U.S. law, as the Government is interpreting it here.

The Government is likely to direct the Court to the case of United States v. Wegelin,

where Bank Wegelin pleaded guilty to U.S. tax crimes.[26]  However, while this may certainly

indicate where the Executive Branch of the U.S. stands on certain legal issues, it is up to the

independent judiciary alone to decide what the law actually is. As of the Spring of 2017, there is

still no decision upholding the Government's theory of conspiracy.  As a result, it is a violation

of the fair notice provision of the Fifth Amendment Due Process clause to prosecute Buck for

this offense.

---

[26] It is worth noting that once Wegelin was indicted, it lost or would soon lose its ability to
engage in U.S. dollar transactions, which would likely have been fatal to the bank even in the
absence of a guilty plea.  This guilty plea, therefore, was prompted by the grim practicalities
facing the bank as much as it was by any legal conclusion of guilt.

2.     Insufficient Constitutional Nexus

The Indictment is clear that Buck provided traditional Swiss banking services from an office in Zurich, Switzerland. Given that he had no presence in the U.S., that he did not market his services to U.S. customers, that he did not provide affirmative tax advice to U.S. persons and that he did not lie to or deceive the IRS, there is not a sufficient connection between his conduct and the United States.

Given the precise conduct alleged here, Buck lacked fair notice as to whether his actions were legal or illegal in the U.S.  Moreover, because Buck's conduct was not directed and purposeful, there is an insufficient nexus to allow the prosecution of him under the Due Process Clause of the Fifth Amendment.

POINT FIVE

IN LIGHT OF THE NON-PROSECUTION AGREEMENTS REACHED WITH OVER EIGHTY SWISS BANKS, WHOSE CONDUCT WAS COMPERABLE IF NOT WORSE THAN BUCK'S, THIS CASE SHOULD BE DISMISSED AS A MATTER OF FUNDAMENTAL FAIRNESS

On August 29, 2013, the Tax Division of the U.S. Department of Justice announced a voluntary disclosure program for Swiss banks that had U.S. customers.[27]  The program allowed eligible banks to avoid criminal prosecution of the entity and its executives in exchange for the payment of a financial penalty and the ongoing cooperation of the bank.

As part of the U.S. Government's Swiss Bank Program, the U.S. Government entered agreements with 80 "Category Two" Swiss banks.[28]  The co-called category two banks were those that admitted that they had provided banking services to U.S. customers knowing that the

---

[27] See Program For Non-Prosecution Agreements or Non-Target Letters For Swiss Banks, Ex. 3.

[28] See Justice Department Announces Final Swiss Bank Program Category 2 Resolution With HSZH Verwaltungs AG, January 27, 2016, Ex. 4.

U.S. customers utilized these services to evade U.S. tax authorities.  In this regard, category two banks admitted criminal activity as that concept had been defined by the U.S. Department of Justice in the context of this investigation: specifically, that the bank knowingly aided U.S. tax payers in wrongfully evading their U.S. tax obligations under U.S. law.

Despite the activity committed by these category two banks and their personnel, no criminal prosecutions of these people or entities were undertaken.  The conduct alleged against Buck is less willful and less directed than that committed by the approximately eighty banks that have received non-prosecution agreements.

Indeed, to the extent that several of these banks actively assisted in the creation of foundations, corporations or other structures under circumstances consistent with active tax evasion, and that the employees of several banks used personal email accounts to communicate with U.S. persons specifically to evade IRS detection, several of the banks engaged in conduct that was more egregious than that alleged against Buck.

Accordingly, as the U.S. Government has developed a comprehensive program in how criminal liability, felony convictions and potential jail sentences are given across the entire field of Swiss banking, it is unfair to treat any individual defendant as an outlier.[29]  The consequences of criminal conviction are too grave to justify such an approach.

The Government's response to this is that Bank Frey was chosen for investigation, and Buck for prosecution, because Bank Frey accepted and maintained U.S. customers, with the knowledge and support of FINMA, at a time when most other Swiss banks were not accepting U.S. clients.  To the extent that the Government views this as a legitimate basis for prosecution,

---

[29] Counsel recognizes that there are several pending indictments against Swiss bankers and asset managers.

surely it is but one among many considerations and should be viewed in a particular context, which has been laid out in this memorandum.

Criminal liability for Swiss bankers must be fact-intensive and based on the particular actions committed by the particular person. It cannot be the case that all Swiss bankers are guilty of conspiring to commit U.S. tax evasion merely because they opened and managed accounts for U.S. beneficial owners, and followed the Swiss law in doing so. Indeed, there must be more deceitful, purposeful and directed conduct than this to lead to individual criminal liability, the grave consequences of a felony conviction, and potentially serving time in another country's jail. That being so, the question is where are the lines separating lawful Swiss banking and unlawful U.S. tax evasion to be drawn? As stated above, this is a question FINMA never did answer. This left each Swiss bank to attempt to answer this vexing question of still-untested U.S. law on its own, without guidance from the country's regulating body.

Moreover, there was no judicial precedent at the time on this issue, and there is still none. To the extent that the Government has taken the position that the indictments of UBS and later of Wegelin provide legal guidance to the banks, this premise is, most respectfully, not legally sound. While the government's indictment of an entity on a particular legal theory can serve as notice about where the executive branch of government - in this case another country's executive branch -- believes the legal lines are drawn, this is a matter that must be passed upon by an independent judiciary, and not prosecutors alone.

In the absence of actual judicial precedent, therefore, it is understandable that FINMA did not venture a guess as to the contours of U.S. tax law. Indeed, even at the time of the writing of this memorandum, the contours of U.S. tax law are far from clear, even in the United States, in large part because there have been no judicial decisions on this topic.

35

Therefore, while the U.S. government has concluded that Bank Frey was brazen and reckless, the bank's belief that it was nonetheless not running afoul of U.S. law cannot be discounted. Indeed, as mentioned, the bank's position is bolstered by this Circuit's jurisprudence on the law of <u>Klein</u> conspiracy.

Because Buck did not actively, purposely and deceptively assist U.S. tax payers in evading their U.S. tax obligations, he is not guilty of this conspiracy. Moreover, because he relied faithfully on the guidance of his employer, his regulator (FINMA) as well as his senior colleagues and at least one attorney trained in the U.S., he acted in good faith that he was abiding not only by the law of Switzerland, but also of the U.S.

His professional and personal life should not be hampered by a felony conviction, nor should he face a jail sentence of up to five years, for his conduct. Buck is thirty-six years old and was just starting his professional life when this Indictment was returned. A felony conviction would end his career in business before it really began.

Additionally, he has done everything in his power to assist the Government in understanding his role in these matters. He has spoken repeatedly with the Government and has told the truth at all meetings. Finally, he has come willingly and voluntarily from his home in Zurich to New York to face these charges.

To the extent that the 80 banks participating in the federal government's Swiss Bank Program provided cooperation in the form of truthful information to the government as a pre-condition to a non-prosecution agreement, Buck has done so as well. As the U.S. Government has created a comprehensive program to address this precise issue, Buck should be given the same consideration. He does not deserve to be possibly convicted and punished, while

thousands of bankers at 80 banks have been given the reprieve of the government's Swiss banking program.

<u>CONCLUSION</u>

For the reasons set forth above, I respectfully request that the Indictment against Buck be dismissed in whole and in part to the extent set forth above.

Respectfully submitted,

MARC AGNIFILO
Of Counsel
Brafman & Associates, P.C.
767 Third Avenue
New York, New York 10017
(212) 750-7800

To:   The Court via ECF
      All Counsel via ECF