```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/28/17
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
UNITED STATES OF AMERICA,                 :
                                          :
        - against -                       :          13 Cr. 0282 (VM)
                                          :
STEFAN BUCK,                              :          **DECISION AND ORDER**
                                          :
                 Defendant.               :
-----------------------------------X
**VICTOR MARRERO, United States District Judge.**

        Defendant Stefan Buck ("Buck") moves to dismiss the one-

count indictment filed by the Government on April 16, 2013

(the "Indictment") charging him with conspiracy to defraud

the United States in violation of 18 U.S.C. Section 371

("Section 371"). ("Motion," Dkt. No. 59.) Having reviewed the

parties' submissions and for the reasons set forth below, the

Motion is DENIED.

## I.    BACKGROUND[1]

A.    ALLEGATIONS

        Buck is a citizen and resident of Switzerland. On or

about June 2007, Buck began working as a client-facing

relationship manager at Swiss Bank No. 1, also known as Bank

Frey. Soon thereafter, in around December 2007, Buck became

---

[1] The factual summary that follows derives from the Indictment, and the
following documents, including any documents or exhibits attached thereto
or referenced therein: the Memorandum of Law in Support of the Motion to
Dismiss the Indictment ("Memorandum in Support," Dkt. No. 60); the
Government's Memorandum of Law in Opposition ("Opposition," Dkt. No. 62);
and the Reply in Support of the Motion for Dismissal ("Reply," Dkt. No.
64). Except where specifically referenced, no further citation to these
sources will be made.

the head of Bank Frey's private banking and, in or about December 2012, was named to the institution's three-person executive board.

On April 16, 2013, the Government filed the Indictment charging Buck and one co-defendant, Edgar Paltzer ("Paltzer," together with Buck, "Defendants"), with defrauding the United States in connection with actions taken during the course of their employment at Swiss Bank No. 1. The Government alleges that, from about 2007 to 2012,[2] Buck participated in a scheme with Paltzer and United States taxpayers to evade tax obligations by creating, maintaining and/or managing undeclared bank accounts held at Swiss Bank No. 1 — accounts not disclosed to the Internal Revenue Service ("IRS") — and enabling United States taxpayers to submit false and fraudulent income tax returns.

The Indictment outlines numerous allegations against Paltzer and Buck regarding six clients ("Client 1" through "Client 6"), all of whom were holders of undeclared accounts. The Government alleges that Buck committed at least two overt

---

[2] The Indictment states that the Defendants participated in the conspiracy "[f]rom at least in or about 2000 through in or about at least 2012[.]" (Indictment ¶ 13.) However, the Indictment also states Buck began working at Swiss Bank No. 1 "[s]tarting in or about June 2007[.]" (Id. ¶ 6.) To the extent the former statement is intended to encompass the entire extent of the conspiracy involving either Paltzer or Buck or both, the Court considers only 2007 to 2012 as the relevant period regarding Buck's alleged role in the conspiracy.

acts in furtherance of the conspiracy: (1) sending checks to Arizona for Client 4 drawn on a corresponding bank account located at another Swiss bank, Wegelin, in the United States, and (2) opening a new undeclared account at Swiss Bank No. 1 for Client 5.

In addition, the Indictment alleges that, during the relevant period, Buck: (1) met and emailed with Client 3 prior to Paltzer opening several undeclared accounts; (2) advised Client 4 and his wife regarding steps to take "in order to avoid the IRS discovering the account" including, among other things, that "Client 4 and his wife should not conduct any transfers in or out of the account in U.S. dollars, because such transfers would 'clear' in the United States and were therefore detectable" (Indictment ¶ 65.b); (3) advised Client 4 and his wife, with respect to the account-opening documents, "to mark 'no' as to whether they required a tax statement" and "leave the section of the account-opening documents dealing with 'tax status' blank" (id. ¶ 65.c); (4) created and used the code word "PV" with Client 4 to refer to account statements, in case Client 4 wanted Buck to send account statements to the United States (id. ¶ 66); (5) told Client 4's wife, after learning Client 4 and his wife received a subpoena for documents and testimony in relation to an investigation of Wegelin, that if he had "sent wire transfers,

rather than checks[,] Client 4's undeclared account would not have been detected" (id. ¶¶ 72-73); (6) advised Clients 5 and 6 that Swiss Bank No. 1 "was a private Swiss Bank with no connection to the United States and that Swiss Bank No. 1 was not bound to make any sort of disclosure to U.S. authorities[,]" after Clients 5 and 6 were referred to Buck when Swiss Bank No. 7 decided to close all accounts held by United States taxpayers (id. ¶ 77; see also id. at ¶ 82-83); and (7) told Client 6 that he did not have to enter a voluntary disclosure program with the IRS regarding his undisclosed accounts, because the Bank's president was a lawyer who knew the rules and "the rules did not apply to Client 6's account" (id. ¶ 85).

Moreover, the Government alleges that, for all or part of the relevant period, Clients 3, 4, 5, and 6 did not disclose their Swiss Bank No. 1 accounts to the IRS in their income tax returns Forms 1040 or file the required Report of Foreign Bank and Financial Accounts ("FBAR").

The Government contends that Buck committed these acts in furtherance of a conspiracy to defraud the United States, namely the IRS. Specifically, the Government contends that it was a part and an object of the conspiracy, of which the Government alleges Buck was a part, to (1) willfully and knowingly attempt to evade or defeat United States income tax

4

obligations, in violation of 27 U.S.C. Section 7201 (see
Indictment ¶ 89), and (2) willfully and knowingly prepare tax
returns, statements, and other documents made under penalties
of perjury that Buck and his co-conspirators "did not believe
to be true and correct as to every material matter," in
violation of 26 U.S.C. Section 7206(1) (Indictment ¶ 90).

B.    MOTION TO DISMISS THE INDICTMENT

Buck argues that the Indictment should be dismissed for
the following reasons: (1) the "defraud the United States"
object of the conspiracy offense is unconstitutionally vague;
(2) the charged conspiracy does not apply extraterritorially;
(3) application of the conspiracy offense would conflict with
Swiss Bank-Client confidentiality laws; (4) Fifth Amendment
Due Process principles preclude the prosecution of Buck; and
(5) fundamental fairness requires that this matter be
dismissed, because numerous non-prosecution agreements were
reached with Swiss bankers involved in conduct equal to or
worse than Buck's.

In particular, Buck argues that the "defraud the United
States" object of the conspiracy is overly broad; that "such
broad language must be limited to 'plainly and unmistakably'
criminal conduct"; and that Buck's "conduct was not 'plainly
and unmistakably' within the purview of the defraud
provision." (Memorandum at 23 (citing Skilling v. United

5

States, 561 U.S. 358, 364 (2010) and United States v. Gradwell, 243 U.S. 476, 485 (1917).) In support, Buck cites several Supreme Court cases involving Section 371 and argues that "[t]he crux of these decisions is that . . . conspiratorial liability is limited to those conspirators who themselves lie to, or engage in purposely deceptive conduct toward, the U.S. or an agency such as the IRS[,]" and that the Indictment does not allege that Buck engaged in the requisite conduct. (Id.)

Buck further argues that, because his conduct took place entirely in Switzerland, in order for the charged conspiracy offense to apply to his conduct, "this Court would have to find that Congress specifically intended it to apply to extraterritorial conduct." (Id. at 26 (citing Kiobel v. Royal Dutch Petroleum Co., __ U.S. __, 133 S.Ct. 1659 (2013) and Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010)).) Buck maintains that Congress did not so intend with respect to the tax evasion provision (26 U.S.C. Section 7201), the false declaration provision (26 U.S.C. Section 7206), or Section 371. Moreover, with respect to Section 371, Buck further argues that conspiracy to defraud the United States "is a common law crime, created by the courts rather than by Congress[,]" in which case Congress could not confer such extraterritorial reach on a statute it did not create.

6

(Memorandum at 29 (quoting United States v. Coplan, 703 F.3d 46, 61 (2d Cir. 2012)).)

Buck also asserts that any extraterritorial application of Section 371 would conflict with Swiss bank secrecy law. Buck contends that the Government's allegations show that "Buck did nothing more than what every Swiss banker did under the law of bank secrecy" by "inform[ing his] U.S. customers that he was not legally permitted to disclose their account at the bank." (Memorandum at 31.) Buck argues that, if he had disclosed the name of any account holder, such disclosure would have constituted a crime in Switzerland. (See id.) Buck contends that the application of Section 371 to his conduct would, therefore, create a conflict between Swiss and United States law, and that longstanding canons of statutory interpretation require that the statute be interpreted to avoid such a conflict. (See id. (citing Murray v. Schooner Charming Betsy, 6 U.S. 64 (1804) (Marshall, C.J.)).) Accordingly, Buck concludes, this Court should "narrowly interpret the scope of the charged conspiracy to preclude application to Swiss bankers such as Buck." (Memorandum at 31.)

Buck argues that, even if this Court finds that Section 371 applies extraterritorially, his prosecution should nonetheless be precluded on Fifth Amendment Due

Process grounds, namely, that "Buck lacked fair notice that his particular conduct was unlawful in the United States . . . [and] that there is an insufficient constitutional nexus between Buck's conduct and the [United States] given the facts alleged in the Indictment." (Id. at 32.) Buck maintains that he had no notice because his conduct was legal in Switzerland and because there is "no decision upholding the Government's theory of conspiracy." (Id.) Moreover, Buck claims that there is an insufficient constitutional nexus because (1) he provided "banking services from an office in Zurich, Switzerland"; (2) "he had no presence in the U.S. . . . [and] did not market his services to U.S. customers"; (3) "he did not provide affirmative tax advice to U.S. persons"; and (4) "he did not lie to or deceive the IRS[.]" (Id. at 33.)

Finally, Buck contends that fundamental fairness requires dismissal of this case. Because non-prosecution agreements were reached with over eighty Swiss banks that admitted they knowingly provided services to United States customers seeking to evade United States tax authorities and Buck's alleged conduct was less willful or directed than that of persons who were given the benefit of non-prosecution agreements, Buck argues that this case must be dismissed. (Id. at 33-37.)

8

In opposition, the Government asserts that (1) Buck's vagueness challenge is premature and unsupported by the factual allegations contained in the Indictment; (2) the charged conspiracy is not extraterritorial, though all of the objects charged would have extraterritorial application; (3) application of the charged conspiracy does not conflict with Swiss law; (4) application of the charged conspiracy does not violate Due Process; and (5) fundamental fairness does not require dismissal of this case.

The Government contends that the vagueness challenge is premature, because in challenges not implicating First Amendment rights, a statute "is assessed for vagueness only 'as applied,' i.e.[,] in light of the specific facts of the case at hand and not with regard to the statute's facial validity." (Opposition at 7 (quoting United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003)).) Accordingly, the Government argues that the merits of such a challenge cannot be assessed without evaluating the facts of the case, which cannot be done at this stage in a criminal proceeding. (See Opposition at 8.)

Nonetheless, the Government notes that the Second Circuit has held that "the conspiracy to defraud prong of [Section 371] 'not only includes the cheating of the Government out of property or money, but also the means to

9

interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.'" (Id. (quoting United States v. Klein, 247 F.2d 908, 916 (2d Cir. 1957)).) The government maintains that it has met this requirement by alleging that Buck "caus[ed] others to make 'false statement[s]' on their tax returns"; "'provid[ed] ideas or means by which a U.S. taxpayer could evade the IRS'"; and "engaged in 'affirmative [acts] to actively aid, or conspire with, U.S. taxpayers[.]'" (Opposition at 9 (quoting and citing Indictment ¶¶ 14(f)-(g), 62, 65(b), 66, 70, 74, 79, 82, 85, 86).)

The Government further argues that Buck and his co-conspirators committed several overt acts on United States soil that provide a sufficient domestic nexus to avoid the question of extraterritoriality. (See Opposition at 9-11.) Nonetheless, the Government contends that Section 371 would be applied extraterritorially here because the "presumption against extraterritoriality does not apply to a certain class of criminal statutes – ones that are 'not logically dependent on their locality,' but 'are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated[.]'" (Id. at 11 (quoting United States v. Bowman, 260 U.S. 94, 98 (1922)).) Thus, because "[s]tatutes prohibiting crimes against the United States government may

be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended[,]" and the objects of the conspiracy alleged here were directed at the United States Government, specifically the IRS, the Government maintains that Section 371 applies extraterritorially here. (Opposition at 12 (emphasis in original)(quoting United States v. Vilar, 729 F.3d 62, 73 (2d Cir. 2013)).)

The Government also argues that Buck has constructed a false conflict of laws. The Government notes that "Swiss laws that require Buck to maintain the confidentiality of clients' information did not require him to support tax evasion in his role as a banker." (Opposition at 15.) The Government argues that "[t]here would only be a tension between Swiss and U.S. law if it were the case that Swiss law required its bankers to aid U.S. clients in avoiding their tax obligations," but Swiss law does not so require. (Id. (emphasis in original).) However, the Government contends that, even if such a conflict existed, international law would permit the prosecution in accordance with (1) the objective territorial principle, which permits "jurisdiction over conduct committed outside the state that has, or is intended to have, a substantial effect within its borders" and (2) the protective principle, which permits "criminal jurisdiction . . . over acts committed outside the state that harm the state's interest."

11

(Opposition at 15-16 (citing United States v. Yousef, 327 F.3d 56 (2d Cir. 2003)).)

The Government further argues that Buck's Fifth Amendment Due Process challenges are without merit. Regarding notice, the Government asserts that, "[g]iven his frequent contact with American clients, it is difficult to imagine that Buck was ignorant of basic U.S. tax laws or was unaware that other banks engaging in similar criminal conduct were being investigated by U.S. authorities." (Opposition at 17.) In addition, the Government notes that Buck "served as the head of private banking at [Swiss Bank No. 1 and] is alleged . . . to have routinely opened accounts at Bank Frey for U.S. clients fleeing other Swiss banks" at around the same time that several well-known Swiss banks were being openly investigated by United States authorities. (Id. at 18.) The Government argues these circumstances are sufficient for Buck to have been given fair warning of the scope of the United States tax laws. (Id. at 17 (citing United States v. Al Kassar, 660 F.3d 108 (2d Cir. 2011)).)

Moreover, regarding constitutional nexus, the Government contends that "[g]iven the government's strong incentive to enforce its tax laws all around the globe, 'it cannot be argued seriously that the defendant['s] conduct was so unrelated to American interests as to render [his]

12

prosecution in the United States arbitrary or fundamentally unfair.'" (Opposition at 19-20 (quoting United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003)).)

Finally, in response to Buck's claim that the Indictment must be dismissed because other Swiss bankers have entered into non-prosecution agreements, the Government argues that this argument lacks legal basis. (See Opposition at 21.) Moreover, the Government notes that Buck is "far from the only Swiss person to be charged with conspiring with others to hide money from the IRS. Numerous Swiss bankers and asset managers have been indicted for this conduct[,]" and, accordingly, it is not fundamentally unfair to proceed with Buck's prosecution. (Id.)

Buck argues in his reply that because the Indictment does not allege "that Buck lied, counseled another to lie, or provided false and misleading information to a U.S. taxing authority, this Indictment is unconstitutionally vague." ("Reply," Dkt. No. 64, at 7 (citing United States v. Coplan, 703 F.3d 46 (2d Cir. 2012)).)

The Reply also disputes the Government's contention that certain statements by Buck alleged in the Indictment were intended for the purposes of tax-avoidance, and argues that those statements are too ambiguous to support such inference. (See id. at 3-5.) Buck notes that several of the statements

mentioned in the Indictment were "truthful statement[s] . . . . not indicative of criminal conduct." (Id. at 6.) Buck states that these factual concerns highlight that the Indictment fails to show willfulness, which "under the tax laws requires a voluntary, intentional violation of a known legal duty." (Id. at 5 (internal citation and quotation marks omitted).) Buck argues that these principles "apply to a court's review of the sufficiency of an indictment." (Reply at 6 (citing United States v. Pirro, 212 F.3d 86 (2d Cir. 2000)).)

Buck further argues that the viability of case law cited by the Government in support of extraterritoriality is doubtful. Namely, Buck contends that Morrison, 561 U.S. 247 (2010), and RJR Nabisco, Inc. v. European Cmty., __ U.S. __, 136 S.Ct. 2090 (June 20, 2016), cast a shadow of doubt over Bowman, 260 U.S. 94 (1922), and stand for the proposition that "'[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application[.]'" (Id. at 8 (quoting RJR Nabisco, 136 S.Ct. at 2100).)

Finally, Buck disputes the Government's contentions and reiterates his positions regarding conflict of laws, due process, and fundamental fairness. Buck notes in particular that the Government's reliance on United States v. Al Kassar, 660 F.3d 108 (2d Cir. 2011), and United States v. Bin Laden,

14

92 F. Supp. 2d 189 (S.D.N.Y. 2000), is misguided and does not support the proposition that Buck was on notice of potential prosecution. (See id. at 9.) Lastly, Buck closes with a new argument, namely that, to the extent the Court may find any ambiguity in the applicable criminal statutes as applied here, the Court should interpret that ambiguity in favor of Buck, as permitted by the rule of lenity. (See id. at 10.)

## II.  **LEGAL STANDARD**

On a pretrial motion to dismiss an indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the Court takes the allegations in the indictment as true. See United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985). In addition, "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992).

Under the applicable standard, the Court does not consider the sufficiency of the evidence at this early stage in the proceedings, but rather focuses on the legal sufficiency of the indictment itself without looking any further. See United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998). Rule 7(c) of the Federal Rules of Criminal Procedure provides that the indictment "must be a plain, concise, and definite written statement of the essential

facts constituting the offense charged." Fed. R. Crim. P. 7(c).

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974); see also United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012) (holding that the "core of criminality" of an offense about which a defendant must be on notice "involves the essence of a crime, in general terms . . . [and] the particulars of how a defendant effected the crime falls [sic] outside that purview.") Thus, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Alfonso, 143 F.3d at 776 (quoting Stavroulakis, 952 F.2d at 693).

### III. DISCUSSION

Upon review of the parties' respective submissions on Buck's Motion and relevant law, the Court is not persuaded that the Indictment should be dismissed.

Buck argues that the "defraud the United States" object of the conspiracy is unconstitutionally vague and "must be

16

limited to 'plainly and unmistakably' criminal conduct[,]"
and, moreover, that Buck's "conduct was not 'plainly and
unmistakably' within the purview of the defraud provision."
(Memorandum at 23.) However, evaluating Section 371 as
applied and taking the allegations in the Indictment as true,
as the Court must at this stage, a conspiracy with United
States taxpayers to avoid reporting overseas bank accounts
and evade income tax obligations would plainly and
unmistakably defraud the IRS, and thus the United States, of
money to which the Government is entitled. See United States
v. Rosengarten, 857 F.2d 76, 79 (2d Cir. 1988) ("A conspiracy
to frustrate or obstruct the IRS's function of ascertaining
and collecting income taxes falls clearly within the ban of
section 371."); Klein, 247 F.2d at 916 (finding that Section
371 "not only includes the cheating of the Government out of
property or money, but also means to interfere with or
obstruct one of its lawful governmental functions by deceit,
craft or trickery, or at least by means that are dishonest")
(internal quotation marks omitted). Buck's arguments on this
point ultimately amount to challenging the truth of the
allegations or his lack of intent to defraud. Such contentions
raise questions of fact that are more appropriately addressed
at trial and constitute insufficient bases to dismiss the
Indictment.

17

Moreover, the cases on which Buck relies on this point do not support his argument. First, Hammerschmidt and Gradwell are inapposite. See Hammerschmidt v. United States, 265 U.S. 182 (1924) (holding that advocating for disobeying the Selective Service Act was insufficient to support a conviction for conspiracy to defraud the United States); United States v. Gradwell, 243 U.S. 476, 478 (1917) (holding that engaging in a scheme arranging for unqualified voters to vote at all or more than once was not "plainly and unmistakably" prohibited by the statute). Next, in the tax fraud context, Buck argues that United States v. Klein, 247 F.2d 908 (2d Cir. 1957), is distinguishable from the instant case because the attorneys in that case lied "directly to Treasury officials in order to falsely minimize a client's tax obligation" and, accordingly, does not support the broad applicability of the defraud provision in this case. In a similar vein, Buck relies on United States v. Coplan, 703 F.3d 46 (2d Cir. 2012), in which the Second Circuit reversed the conspiracy convictions of two defendants due to "insufficient evidence that they had lied, coached another to lie, or otherwise provided misleading information about a tax shelter at issue." (Memorandum at 25.) But these cases are unavailing under the circumstances presented here. The Indictment need not allege that Buck lied directly to a United

18

States Treasury official or IRS agent in order to sufficiently allege a violation of Section 371. See, e.g., Rosengarten, 857 F.2d at 79. Moreover, Coplan invalidated the defendants' convictions, not the sufficiency of the indictment.

Regarding extraterritoriality, it is possible that the alleged transactions involving checks Buck or co-conspirators sent to Arizona are sufficient to show a domestic connection, in which case Section 371 need not be applied extraterritorially to reach Buck's conduct in this case. See United States v. Zarrab, No. 15 Cr. 867, 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) (finding sufficient domestic connection where a defendant "caused an international wire transfer from the U.A.E. to [a] Canadian company in the amount of approximately $953,289, which was processed by a United States bank").

Regardless of whether there is a domestic connection, however, the Court finds that Section 371 has extraterritorial application in this case insofar as "[s]tatutes prohibiting crimes against the United States government may be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended[.]" Vilar, 729 F.3d at 73. Here, the alleged conspiracy is directed at an agency of the United States, namely the IRS,

and thus as warranted by Vilar, Section 371 may be applied extraterritorially.

The Court is not convinced that Kiobel, Morrison, or RJR Nabisco compel a different result. All three of those cases involved civil suits brought by private parties, and thus did not encompass fraud against the United States government. Kiobel concerned a lawsuit brought by Nigerian nationals residing in the United States against Dutch, British, and Nigerian corporations, pursuant to the Alien Tort Statute ("ATS"), alleging unlawful conduct that occurred in Nigeria. There, the Supreme Court held that Congress had not expressly provided for the ATS to apply extraterritorially and, therefore, Plaintiffs did not overcome the presumption against extraterritoriality. 569 U.S. 108. Morrison was a putative class action brought by foreign investors against an Australian bank, claiming violations of the Securities and Exchange Act of 1934. 561 U.S. at 251-53. While the Supreme Court held in Morrison that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none[,]" that proposition was stated in the context of a private civil action. Id. at 255. Likewise, RJR Nabisco involved a civil action under the Racketeering Influenced and Corrupt Organizations Act ("RICO") brought by the European Community, acting on behalf of its member states, against RJR

20

Nabisco, a cigarette manufacturer. 136 S.Ct. at 2098. In that case, the Supreme Court held that RICO <u>does</u> apply extraterritorially, but that the statute's private right of action "does not overcome the presumption against extraterritorially" and thus "[a] private RICO plaintiff . . . must allege and prove a domestic injury to its business or property." <u>Id.</u> at 2095 (emphasis in original omitted).

Relevant here, all three of these cases are silent with respect to the application of extraterritoriality in the context of criminal prosecution. Indeed, none of the decisions refers to <u>Bowman</u> or calls the holding of that case into question, as Buck contends. Thus, the Court finds that <u>Kiobel</u>, <u>Morrison</u>, and <u>RJR Nabisco</u> have no bearing on criminal actions brought by the United States Government to prosecute criminal offenses committed abroad that defraud the United States.

The Court is also not convinced that this case, as Buck contends, presents a conflict between Swiss and United States laws. While Buck states that the conflict exists because the Swiss law of bank secrecy requires that he not disclose the name of any account holder, even in the context of a criminal prosecution, the Indictment does not allege that Buck violated Section 371 because he failed to disclose the names of his clients to the IRS. Rather, the Indictment charges

21

that Buck made many statements and took several actions in furtherance of a conspiracy to evade the obligations of United States taxpayers, including by, assisting United States taxpayers in the nondisclosure of their own accounts, in filing untruthful tax documents, or in failing to file required tax documents altogether.

Buck argues that any "[c]riminal liability for Swiss bankers must be fact-intensive and based on the particular actions committed by the particular person. It cannot be the case that all Swiss bankers are guilty of conspiring to commit U.S. tax evasion merely because they opened and managed accounts for U.S. beneficial owners[.]" (Memorandum at 35.) Buck may be right on this score, but his argument misses the point. The Indictment does not charge all Swiss bankers and it does not allege that Buck merely opened and managed traditional Swiss bank accounts for United States taxpayers. As the Government notes, it "has not sought to 'criminalize a broad array of conduct encompassing all activities engaged in by Swiss bankers[,]' but rather has brought a case against a specific Swiss banker – Buck – based on his [alleged] conduct[.]" (Opposition at 3.)

Specifically relating to Buck, the Indictment charges he made numerous statements to clients regarding whether they should or should not report their accounts; sent checks to

22

the United States; and allegedly told clients facing subpoenas that wire-transfers would have prevented accounts from being detected, among other things. The Indictment further alleges that Buck's statements and actions in this regard were willful or knowing. (See Indictment ¶¶ 89-90.) Whether these accusations are true or what intent underlay Buck's statements and actions are precisely the kinds of evidentiary questions that should be evaluated by a jury, and not by this Court as a pre-trial matter.

Regarding Buck's Fifth Amendment Due Process claims, the Court finds that Buck received adequate notice of the possibility of prosecution and that there is a sufficient constitutional link to the United States and United States interests involving Buck and the criminal conduct he is charged with having engaged in outside of this country. Buck argues that he did not receive notice because he "did not market his services to U.S. customers"; "provide affirmative tax advice to U.S. persons"; or "lie to or deceive the IRS[.]" (Memorandum at 33.) But, the Indictment alleges that several Swiss Bank No. 1 clients were referred to Buck by other Swiss banks that were closing all accounts of United States taxpayers, and that Buck and Swiss Bank No. 1 readily accepted their business. Moreover, while Buck disputes the intent behind his statements informing clients regarding whether or

not they must disclose the accounts to United States authorities or file appropriate tax forms, the Indictment's allegations, taken as true, are sufficient to give Buck notice of charges of unlawful conduct. Any factual disputes Buck may have in this connection are better addressed to a jury.

Furthermore, while the Indictment does not allege that Buck personally lied to or directly deceived the IRS, it does allege that Buck made statements to co-conspirator clients as to how detection of accounts could have been avoided, and discouraged them from voluntarily disclosing their accounts. Again, while these accusations have not been proven at this stage, the allegations are sufficient, and, if true, would have provided Buck appropriate notice in general terms about the essence of the crime of which he is accused. See D'Amelio, 683 F.3d at 418 (2d Cir. 2012) (finding a defendant must be on notice of "the essence of a crime, in general terms" but that "the particulars of how a defendant effected the crime falls [sic] outside that purview").

Regarding the constitutional connection to the United States in this case, the Second Circuit has adopted the standard used by the Ninth Circuit for determining "the extent to which the Due Process Clause limits the United States' assertion of jurisdiction over criminal conduct committed outside our borders." Yousef, 327 F.3d at 111. That standard

24

requires "that '[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.'" Id. (quoting United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)). The Court agrees with the Government that, given the United States' significant interest in enforcing its tax laws against taxpayers not only in the United States but also abroad, Buck's alleged conduct is not "so unrelated to American interests as to render [his] prosecution in the United States arbitrary or fundamentally unfair." Yousef, 327 F.3d at 111.

Finally, the Court finds Buck's arguments that fundamental fairness and the rule of lenity require dismissal of the Indictment unavailing.

Accordingly, the Court holds that the Indictment is legally sufficient and declines to dismiss it at this stage.

## IV.  ORDER

For the reasons set forth above, it is hereby

**ORDERED** that the motion (Docket No. 59) of defendant

Stefan Buck to dismiss the underlying indictment is DENIED.

**SO ORDERED.**

Dated:    New York, New York
          28 August 2017

Victor Marrero
U.S.D.J.

26